**F I L E D**

PUBLISH

**SEP 28 2001**

UNITED STATES COURT OF APPEALS

TENCIRCUIT TENTH CIRCUIT

---

ECHO ACCEPTANCE CORP., a
Colorado corporation and
ECHOSPHERE CORPORATION, a
Colorado corporation,

    Plaintiffs - Appellees - Cross-
    Appellants,

vs.

HOUSEHOLD RETAIL SERVICES,
INC., a Delaware corporation,

    Defendant - Appellant - Cross-
    Appellee.

Nos. 00-1167 and 00-1190

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 95-WY-605-WD)

---

T. Wade Welch (Ross W. Wooten, with him on the briefs), T. Wade Welch &
Associates, Houston, Texas, for Plaintiffs - Appellees.

Bruce A. Featherstone (John A. DeSisto, with him on the briefs), Featherstone,
DeSisto, L.L.P. Denver, Colorado, for Defendant - Appellant.

---

Before **KELLY**, **MCWILLIAMS**, and **REAVLEY**[*], Circuit Judges.

---

    [*]The Honorable Thomas M. Reavley, Senior Circuit Judge, United States
Court of Appeals - Fifth Circuit, sitting by designation.

**KELLY**, Circuit Judge.

Defendant Household Retail Services, Inc. ("HRSI" or "Household"), appeals from a jury verdict in favor of Plaintiffs Echo Acceptance Corporation and Echosphere Corporation (collectively, "Echo") on Echo's breach of contract claim. The district court's jurisdiction was based on 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C § 1291 and we affirm.

## Background

The plaintiffs in this case are Echosphere Corporation ("Echosphere"), which manufactures and sells home satellite television systems, and Echo Acceptance Corporation ("EAC"), an Echosphere subsidiary organized to facilitate the financing of such sales.[1] While some Echosphere customers no doubt make their own financial arrangements, Echosphere referred many of its customers to EAC. EAC would then enter a loan agreement with the customer, pursuant to which EAC agreed to finance the system for the customer. EAC then sold the loan agreements to an ultimate financier. Until 1989, that financier was the Central Bank of Denver, which purchased the agreements from EAC for a flat,

---

[1] Both EAC and Echosphere are subsidiaries of EchoStar Communications Corporation. J.A. 2331 (Tr. at 245-46).

up-front fee.  J.A. 249.

On July 7, 1989, EAC entered a Merchandise Financing Agreement ("MFA") with the defendant, Household, a private label credit card company. Pursuant to the MFA, a customer interested in purchasing Echosphere equipment on credit submitted an application to Echosphere, which was transmitted to EAC and then to Household for credit approval.  Upon approval, EAC purchased the customer's financing contract, then resold and assigned that agreement to Household, which thereafter assumed the credit relationship with the customer. Upon assignment, the MFA typically relieved EAC from liability for the customer's default.  Household then issued a credit card to the approved customer to be used for future purchases of Echosphere equipment.  The customer's contract provided for finance charges on the credit account.  Household also offered credit insurance to customers, for a separate charge.  Through the arrangement just described, Household provided funding for credit purchases of Echosphere equipment.  The customers made monthly payments on their account balances toward principal, finance charges, and in some cases, insurance premiums.  Aplt. Br. at 4.

In its initial pricing letter, HRSI confirmed the execution of the MFA and reiterated that it would "purchase from time to time revolving credit contracts at the price agreed upon from time to time and as outlined below:

1)    The consumer Annual Percentage Rate will be 17.88% with a per contract discount of .85% [charged by HRSI].

2)    HRSI will pay EAC 8% (eight percent) of billed finance charges monthly.

3)    HRSI will pay EAC a percent of billed finance charges equivalent to 30% (thirty percent) of billed insurance charges.

4)    HRSI understands that EAC does not initiate retail installment sales or revolving credit sales directly to the consumer. However, HRSI will respond to EAC as though EAC initiates all contracts per the Merchandise Financing Agreement.

J.A. 3013 (Pl. Ex. 6); see also id. at 3006-07 (Pl. Ex. 3) (Merchandise Financing Agreement).  Collectively, the credit agreements originated by EAC and sold to HRSI were referred to as the "EAC Portfolio".  Id. at 2333 (Tr. at 254).

Echo contends, and the district court agreed, that merchant and insurance participation payments were part of the price HRSI paid for EAC's accounts. Aplee. Br. at 40-43; J.A. 1907-08.  Accordingly, the court held that payments on each individual account by HRSI to EAC were to continue for the life of that particular financing arrangement – i.e., as long as HRSI continued to receive revenue from the account.  J.A. 1906-07.  On the other hand, HRSI maintains that the payments were designed merely as incentives to encourage sales.  Aplt. Br. at 38.  In HRSI's view, its payment obligation ended with its interest in encouraging future sales – i.e., when it stopped purchasing new accounts from EAC.  Id.

## Procedural History

As the district court aptly noted: "The word 'simple' should not be used in any sentence involving this case. [T]here's nothing simple about this. It's convoluted and . . . it's a beast with a strange heartbeat." J.A. 2449 (Tr. at 633). We will attempt to simplify the procedural history nonetheless, reciting only those motions, orders, and proceedings relevant to our analysis. Of the four causes of action alleged in Echo's First Amended Complaint,[2] only a portion of the first claim – for breach of contract – is at issue in this appeal. Specifically, we are concerned with Echo's contention that HRSI was contractually obligated to make merchant participation and insurance percentage payments for the life of each individual loan in the EAC portfolio, and that HRSI's failure to make any such payments after the termination of the MFA constituted a breach. Id. at 66-69.

In December 1995, Echo moved for partial summary judgment on that portion of its breach claim, id. at 136-70 [hereinafter "Echo's Breach Motion"]; in February 1996, HRSI filed a cross-motion for summary judgment on the same issue. Id. at 472-510 [hereinafter "HRSI's Cross-Motion"]. Simultaneous with its Cross-Motion, HRSI also filed a separate motion for summary judgment, arguing that all four claims were barred by Colo. Rev. Stat. § 38-10-124, the

---

[2] Echo's First Amended Complaint stated claims for: (1) breach of contract, (2) misrepresentation/fraudulent concealment, (3) promissory estoppel, and (4) wanton and willful misconduct. J.A. 66-74.

statute of frauds for credit agreements.  Id. at 443-61 [hereinafter "HRSI's Statute of Frauds Motion"].[3]  Three years later, the district court entered an order on the foregoing and other motions, denying HRSI's Statute of Frauds Motion, granting Echo's Breach Motion, and denying HRSI's Cross-Motion.  Id. at 1899-1919.  In pertinent part, the court held that § 38-10-124 was inapplicable to Echo's claims as a matter of law.  Id. at 1903-04.  The court also found that the MFA unambiguously provided for payments to continue post-termination, and that HRSI's failure to make such payments was a breach of contract.  Id. at 1906-08.  Finally, the court noted that the determination of the applicable rates for post-termination payments was "a question of fact, appropriately decided by a jury . . . ."  Id. at 1913.

Prior to trial, Echo filed a preemptive Motion in Limine, requesting the exclusion of evidence relating to certain defense theories that the court had already rejected as a matter of law.  Id. at 2147-54.  The court granted the motion in part, confirming that it would not admit evidence or allow arguments concerning: (1) HRSI's statute of frauds defense, or (2) HRSI's claim that post-termination payments were intended as incentives, rather than part of the purchase price.  Id. at 2230-31 (Order on Mot. in Limine); cf. id. at 1903-04, 1907-08

---

[3] At about the same time, HRSI also moved to dismiss Count IV in part, J.A. 940-42, and for summary judgment as to Count III.  Id. at 866-83.  Those motions are not relevant to this appeal.

(Order on Mots. for Summ. J.).  The remainder of Echo's motion was taken under advisement.  Id. at 2231-32 (Order on Mot. in Limine).

In a conference with counsel at the close of Echo's case, the court clarified that "the only fact issue here is what's the percentage that applies."  Id. at 2446 (Tr. at 623).  In HRSI's view, this announcement constituted a "restructuring" of the trial, which prejudiced its case in a variety of ways.  Aplt. Br. at 18-19, 44-50.  Accordingly, HRSI moved the court: (1) for a "curative instruction," advising the jury to disregard evidence relating to the monetary amount of damages, J.A. at 2459, 2488 (Tr. at 672-75, 788-89) (oral motion); (2) to strike specified testimony and exhibits relating to the amount of damages, id. at 2461-62, 2488 (Tr. at 683-86, 788) (oral motion); see also id. at 2431-41 (brief); and (3) to declare a mistrial.  Id. at 2487-88 (Tr. at 786-89); see also id. at 2755-2814 (brief).  HRSI also moved that the court enter judgment in its favor as a matter of law, arguing that Echo had failed to establish any agreement between the parties as to post-termination rates.  Id. at 2485-86 (Tr. at 779-81) (oral motion); see also id. at 2731-54 (brief).  Subject to the foregoing motions, HRSI rested its case.  Id. at 2489 (Tr. at 792).  All four motions were denied.  Id. at 2882-89 (denying motions for mistrial and for judgment as a matter of law); id. at 2462, 2527 (Tr. at 684-86, 798-99) (denying motions to strike and for curative instruction).  But cf. id. at 2626 (Inst. 15: "You need not be concerned with the actual monetary

amount owed by HRSI to EAC . . . .").

In response to a special interrogatory, the jury found that Echo "had proven, by a preponderance of the evidence, that the applicable merchant participation rate was 10% and the applicable insurance participation rate was 30%, <u>as agreed upon by the parties and evidenced by a letter from Defendant</u>[.]" <u>Id.</u> at 2523 (emphasis added). The court then applied the jury's percentage to the stipulated value of the portfolio, granted Echo's motion for prejudgment interest, and entered judgment for Echo in the amount of $4,840,609 – $3,965,534 in past damages, $730,824 in prejudgment interest, and $144,251 in future damages. <u>Id.</u> at 2991-92. The court awarded prejudgment interest at the statutory rate of eight percent, but reduced the interest award by one-third "in the interest of fairness," due to the court's delay in ruling on the parties' motions for summary judgment. <u>Id.</u> at 2887. Both parties filed motions to alter or amend the judgment. <u>See</u> Fed. R. Civ. P. 59(e). HRSI objected to the court's methodology in calculating damages. J.A. 2896-2914. Echo objected to the prejudgment interest award, contending that the court abused its discretion by failing to award "moratory interest" at a rate higher than the statutory minimum, and reducing the total interest award. <u>Id.</u> at 2960-66. HRSI's motion was granted; Echo's was denied. <u>Id.</u> at 2980-87. This appeal followed.

Discussion

On appeal, HRSI claims that the court erred – as a matter of law and of procedure – in holding that the MFA is not subject to Colo. Rev. Stat. § 38-10-124. Second, HRSI contests the district court's holding that the MFA unambiguously provides for merchant participation and insurance percentage payments to continue after the MFA has itself been terminated. Based on the foregoing arguments, HRSI insists that it was entitled to summary judgment on the portion of the breach claim at issue. Third, HRSI argues that the evidence adduced by Echo did not provide the jury with an adequate basis to determine damages, and that HRSI was therefore entitled to judgment as a matter of law. In the alternative, HRSI claims that the uncertainty of Echo's damages precluded any award beyond nominal damages. Fourth, HRSI claims that various trial errors caused such prejudice to its case that they resulted in a mistrial. Echo disagrees with each of the foregoing arguments, and cross-appeals from the court's prejudgment interest award on the same grounds asserted in its Rule 59(e) motion.

I.   HRSI's Statute of Frauds Defense

Under Colo. Rev. Stat. § 38-10-124, claims "relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars" are barred unless the credit agreement is in writing. Colo. Rev. Stat. § 38-10-124(2). According to HRSI, the MFA is a "credit agreement," and the statute therefore

bars Echo's claims "relating to" the MFA.[4]  Aplt. Br. at 25-29.  In the alternative, HRSI contends that even if the MFA is not a credit agreement, § 38-10-124 is still applicable because Echo's claims "relate to" the individual credit agreements assigned to HRSI.  Id. at 29.  In its order on the parties' respective motions for summary judgment, the district court concluded that the § 38-10-124 was inapplicable as a matter of law.  J.A. 1903-04.  Upon de novo review, see Medina v. City & County of Denver, 960 F.2d 1493, 1500 (10th Cir. 1992), we agree with the district court's conclusion.

HRSI must establish three elements to invoke § 38-10-124: (1) that at least one plaintiff is a statutory "creditor or debtor," (2) that Echo's claims relate to a credit agreement, and (3) that the underlying credit agreement involves a principal amount in excess of $25,000.  Colo. Rev. Stat. § 38-10-124(2) ("[N]o debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought.").  Both at trial and on appeal, the parties' primary focus

---

[4] On August 11, 2000, HRSI moved this court to certify the question of whether the MFA and letters incorporated therein "constitute a 'credit agreement,' between a statutory 'debtor' and 'creditor,' to which § 38-10-124, C.R.S. applies" to the Colorado Supreme Court.  On February 8, 2001, HRSI filed an unopposed motion to withdraw its Motion to Certify.  The Motion to Withdraw is granted.  As is evident from our analysis above, the parties' dispute as to the propriety of the arguments contained in the Motion to Withdraw is moot.

has been the second element: whether the claims relate to a credit agreement.[5]

A.     Echo's Claims Do Not Relate to a Credit Agreement

The MFA plainly indicates that HRSI is purchasing commercial paper ("Contract and Slips"). See J.A. 3006 ("Seller [EAC] desires [Household] to purchase from time to time said Contracts and Slips at the price agreed upon from time to time by Seller and Household and evidenced by Household's letter."). Thus, the claims in this case relate to the purchase of commercial paper. As the defendant conceded at oral argument, there is no Colorado authority to support the construction of the MFA itself as a credit agreement, and in the absence of such authority, we decline to treat it as one. Section 38-10-124 defines "credit agreement," in pertinent part, as "[a] contract, promise, undertaking, offer, or commitment to lend, borrow, repay, or forbear repayment of money, to otherwise extend or receive credit, or to make any other financial accommodation . . . ." Colo. Rev. Stat. § 38-10-124(1)(a)(I) (emphasis added). In HRSI's view, our interpretation of the phrase "financial accommodation" is not limited by the other terms in the definition. See Aplt. Br. at 25 ("[T]he statutory definition is not

_____

[5] We decline to address HRSI's conclusory assertion that Echosphere is "not a proper party on the claim for post-termination participation," which only appears in a footnote to HRSI's opening brief. Aplt. Br. at 29 n.3. We have consistently held that "[a]rguments inadequately briefed in the opening brief are waived . . . ." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998).

- 11 -

limited only to a lending of money or an extension of credit . . . .").  We disagree.

Colorado courts interpret statutory language to "reach a reasonable result consistent with the General Assembly's intent, and . . . [to] give harmonious effect to all of the statute's parts."  Sky Fun 1 v. Schuttloffel, 27 P.3d 361, 370 (Colo. 2001) (internal quotations and citation omitted); see also Colo. Dept. of Revenue v. Cray Computer Corp., 18 P.3d 1277, 1281 (Colo. 2001) ("[W]e consider statutes as a whole in order to effectuate legislative intent, and give consistent, harmonious, and sensible effect to all the statute's parts.") (internal quotations, citation, and alteration omitted).  The Colorado Supreme Court has held that the purpose of § 38-10-124 is to "discourage lender liability litigation and to promote certainty [in] credit agreements involving sums of more than $25,000."  Schoen v. Morn's, 15 P.3d 1094, 1098 (Colo. 2000).  Because HRSI's broad construction of "financial accommodation" would effectively graft an all-encompassing catch-all onto an otherwise specific statute, thereby eviscerating the statute's focus on credit agreements, we must reject it.  See Matter of Title, Ballot Title & Submission Cl., & Summ. for 1997-98 No. 62, 961 P.2d 1077, 1079 (Colo. 1998) ("We must read and interpret statutory language in its context.").

An agreement for the purchase of commercial paper, such as the MFA, is not a "financial accommodation" as that term is used in § 38-10-124.  "Financial

accommodation" must be construed in light of the overall purpose of the statute, in a manner that is consistent with the rest of the statutory language. That language is clearly concerned with transactions and agreements that involve the extension or receipt of credit, and "financial accommodation" cannot be read without that context in mind. Cf. Beecham v. United States, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). We therefore agree with the district court's conclusion that the MFA is not a credit agreement. J.A. 1904, 2071.

B.     Echo's Claims Do Not "Relate To" the Underlying Customer Credit Agreements for Purposes of § 38-10-124

In the alternative, HRSI argues that even if the MFA itself is not a credit agreement, Echo's claims still "relate to" a credit agreement in that the claims "relate to" the MFA, which in turn, "relates to" the individual credit agreements and the balances assigned to HRSI. Cf. Univex, 914 P.2d at 1358. This argument also fails. We agree with the district court's legal conclusion that the once-removed connection between Echo's claims and the credit agreements is too attenuated to justify the application of § 38-10-124. J.A. 1904. To permit such a broad reading of the phrase "relating to a credit agreement" would be inconsistent with the statute's exclusive concern with discouraging lender liability litigation and promoting certainty in credit agreements. Schoen, 15 P.3d at 1098; see

- 13 -

generally Stephanie J. Shafer, "Limiting Lender Liability Through the Statute of Frauds," 18 Colo. Law. 1725 (1989). Accordingly, we do not believe the Colorado Supreme Court would adopt the interpretation urged by HRSI, and we affirm the district court's conclusion that Colo. Rev. Stat. § 38-10-124 is inapplicable.[6]

C.     No Procedural Error

Finally, HRSI contends that the district court "erred in granting summary judgment against HRSI without notice." Aplt. Br. at 31. This argument is also unavailing, in part because it mischaracterizes the district court's ruling as to § 38-10-124. The court denied HRSI's Statute of Frauds Motion on purely legal

---

[6] HRSI's once-removed theory also fails because the individual credit agreements at issue involved principal amounts in the $2200 to $2500 range – far below the statutory threshold of $25,000. J.A. 3014 (Pl. Ex. 18) (showing average new sales on a monthly basis from Sept. 1989 to May 1990); id. at 3017 (Pl. Ex. 24) (same, for 1990); id. at 3035 (Pl. Ex. 80) (same, for 1991 and 1992); id. at 3038 (Pl. Ex. 81) (same, for 1993 and 1994); id. at 3044 (Pl. Ex. 82) (same, for 1994 and 1995). There is nothing in the record to indicate that any individual credit agreement entered by EAC and sold to HRSI under the MFA involved a principal amount in excess of $25,000, and the individual agreements cannot be aggregated to meet the statutory minimum. Cf. J.A. 454 (Def. Mot. for Summ. J. on All Claims Pursuant to C.R.S. § 38-10-124: "[T]he principal amount is not, and should not be, calculated by reference to amount of any individual consumer loan. Rather, the amount is determined by the entire principal sum of the financial accommodation between defendant and plaintiffs."). The plain language of the statute indicates that the phrase "involving a principal amount in excess of twenty-five thousand" qualifies the term "credit agreement," not "claim." Colo. Rev. Stat. § 38-10-124(2); accord Schoen, 15 P.3d at 1098 (noting legislative purpose of promoting certainty with respect to "credit agreements involving sums of more than $25,000").

grounds. Given the obviously legal nature of the court's ruling, we cannot fathom how an additional opportunity to present statute of frauds-related <u>evidence</u> could have furthered HRSI's case, nor do we understand why HRSI expected to be able to press its statute of frauds argument to the jury. Although the district court's ruling as to § 38-10-124 did not become the "law of the case" until the entry of final judgment, <u>see United States v. U.S. Smelting Refining & Min. Co.</u>, 339 U.S. 186, 199 (1950); <u>In re Unioil, Inc.</u>, 962 F.2d 988, 993 (10th Cir. 1992), it is axiomatic that the jury's role is as fact-finder. Juries are not empowered to decide questions of law. <u>See, e.g.</u>, <u>Jones v. United States</u>, 526 U.S. 227, 247 n.8 (1999) ("The principle that the jury were the judges of fact and the judges the deciders of law was stated as an established principle as early as 1628 . . . ."); <u>see also</u> <u>Byrd v. Blue Ridge Rural Elec. Cooperative, Inc.</u>, 356 U.S. 525, 537 (1958) ("An essential characteristic of [the federal] system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence – if not the command – of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury.").

II. <u>Post-Termination Participation</u>

Echo's claim for post-termination participation encompasses three sub-issues. First, what is the duration of the defendant's participation obligation? Echo contends that the obligation continues through the life of the individual

- 15 -

loans; HRSI claims that its obligation ended with the termination of the MFA. Second, assuming a post-termination obligation, what are the applicable merchant participation and insurance percentage rates? Echo argues that the applicable rates are 10% and 30%, respectively; HRSI insists that the parties never reached any agreement as to post-termination rates, and that it was therefore entitled either to judgment as a matter of law or to an instruction that the jury could only award nominal damages. See infra Section III. Third, assuming a post-termination obligation and an agreement as to the applicable rates, how should those rates be applied to the EAC Portfolio to compute Echo's total damages? Echo claims that the rate must be applied to the outstanding balance of the entire EAC portfolio, while HRSI contends that different rates apply to different accounts, depending on when each account was created by EAC or sold to HRSI. See infra Section IV(C). In this section, we deal only with the first issue: the duration of HRSI's participation obligation.

In its summary judgment order, the district court held that the MFA "as a whole and the circumstances surrounding its making unambiguously display an intent to continue payments until the termination of the loan agreements." J.A. 1907. We agree. Participation payments are clearly part of the price HRSI agreed to pay for the revenue-producing accounts (revolving credit contracts) it purchased from EAC between 1989 and 1994. We are not persuaded by the

defendant's contention that the MFA's silence as to the duration of HRSI's duty to make participation payments demonstrates the parties' intent to make the participation obligation co-terminous with the MFA. Aplt. Br. at 33-35.

"A fundamental rule of contract law is that the court should strive to ascertain and give effect to the mutual intent of the parties." Pepcol Mfg. Co. v. Denver Union Corp., 687 P.2d 1310, 1313 (Colo. 1984) (citation omitted). "[T]he intent of the parties to a written instrument must be determined primarily from the written terms." KN Energy, Inc. v. Great Western Sugar Co., 698 P.2d 769, 776 (Colo. 1985) (citations omitted). In general, the interpretation of a contract is a question of law, Pepcol, 687 P.2d at 1313, and where the evidence consists exclusively of documents, as in this case, the "law is clear that the determination of their effect is a matter of law." Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc., 577 P.2d 748, 750 (Colo. 1978) (citations omitted). "Whether an ambiguity exists is also a question of law." Pepcol, 687 P.2d at 1314.

With these principles in mind, we turn to the contract at issue. In pertinent part, the MFA provides as follows:

> Undersigned [EAC] (herein called Seller) regularly sells merchandise and desires to offer a plan whereby a qualified customer may elect to make purchases from us from time to time on a revolving credit account (herein called Account). . . . An Account is established by customer execution of a master agreement (herein called Contract) describing his rights and obligations with respect to all purchases made from us on such Account. Once established, purchases may be made on such Account from time to time by means of written

- 17 -

memoranda (herein called Slips). Each [S]lip . . . shall describe . . . the total amount of credit extended.

Seller desires Household Retail Services, Inc. (herein called "Household"), to purchase from time to time said Contracts and Slips at the price agreed upon from time to time by Seller and Household and evidenced by Household's letter.

Id. at 638 (Pl. Ex. 3).[7]  The MFA does not define the word "price," but the first pricing letter outlined the structure of the "price" as including:

1)  The consumer Annual Percentage Rate will be 17.88% with a per contract discount of .85% [charged by HRSI].

2)  HRSI will pay EAC 8% (eight percent) of billed finance charges monthly.

3)  HRSI will pay EAC a percent of billed finance charges equivalent to 30% (thirty percent) of billed insurance charges.

Id. at 645 (Pl. Ex. 6).  The second pricing letter, dated April 16, 1992, also speaks in terms of "pricing".  Id. at 3028 (Pl. Ex. 33).

We recognize that the third letter, dated January 21, 1993, uses the word "incentive" rather than "price".  Id. at 3030-31.  Nonetheless, we do not believe that a subtle and unilateral choice of words in a single letter is sufficient to alter the inherent nature of HRSI's participation commitment as part of the price it had agreed to pay for EAC's Contracts and Slips.  Even a cursory reading of the 1993

_____

[7] Each of the documents referenced in this section appear at least twice in the record on appeal: first as summary judgment exhibits, and second as trial exhibits.  The citations in this section refer to the summary judgment exhibits.

- 18 -

letter reveals that HRSI's use of the phrase "incentive structure" did not refer to the payment of merchant and insurance participation as a general matter. Clearly, "incentive structure" referred specifically to the multi-tiered system outlined in the letter, according to which participation percentages would increase proportionately with total credit volume. Id. at 3030.

To the extent that the district court relied on extrinsic evidence – i.e., "the circumstances surrounding [the contract's] making – to reach the conclusion that the contract was unambiguous as to duration, such reliance was consistent with Colorado law. See, e.g., KN Energy, 698 P.2d at 776-77 (holding that courts may consider extrinsic evidence, including "the circumstances surrounding the making of the contract," in order to determine whether a contractual ambiguity exists). In this case, the summary judgment record included numerous affidavits as to the circumstances surrounding each new pricing arrangement, all of which indicate that participation payments were considered part of the price. For example, James DeFranco of EAC stated that HRSI offered two options for the 1991 pricing agreement – (1) an up-front payment equal to 1% of the opening account balance or (2) merchant participation payments equal to 5% of billed monthly finance charges. E.g., J.A. 245, ¶¶ 4-5 (DeFranco Aff.). Mr. DeFranco also stated that HRSI represented that the two options were financially equivalent, and demonstrated that point by comparing the up-front payment to the participation

- 19 -

payments, "paid at 5% each month until the account balance reached $0.00." Id.
at ¶¶ 6-7 (emphasis added); accord id. at 252-53, ¶¶ 7-11 (Fears Aff.); see also id.
at 249, ¶¶ 6, 8 (Ergen Aff., describing initial negotiations in 1989 and declaring
that HRSI stated that participation payments were part of the purchase price).

In sum, the duration of HRSI's participation obligation was obvious from
the nature of the contract, and confirmed by the terms of the incorporated pricing
letters and the circumstances surrounding the execution of the contract. The price
of each revolving credit contract sold by EAC to HRSI included a percentage of
billed monthly finance charges. Implicit in any arrangement to pay a purchase
price in installments is the expectation that payments will continue until the entire
balance is paid. The fact that the MFA and pricing letters do not explicitly affirm
that common sense expectation does not create an ambiguity. See Cheyenne
Mountain School Dist. No. 12 v. Thompson, 861 P.2d 711, 715 (Colo. 1993)
("Silence does not by itself necessarily create ambiguity as a matter of law."); see
also Radiology Professional Corp., 577 P.2d at 751 ("The mere fact that there is a
difference of opinion between the parties does not of itself create an ambiguity.").
Accordingly, we affirm the district court's conclusion that the contract, including
the MFA and the pricing letters incorporated therein, are unambiguous as to the
duration of HRSI's participation obligation. Such payments were part of the
ongoing price that HRSI agreed to pay for the accounts it acquired from EAC, and

accordingly, the discontinuation of those payments in January 1995 constituted a breach of contract.

III.     HRSI's Motion for Judgment as a Matter of Law: Damages

At the close of Echo's case, HRSI moved for judgment as a matter of law under Rule 50(a), arguing that because the evidence did not show any agreement between the parties as to the rate of post-termination participation, any damages award would be necessarily speculative and therefore void under Colorado law. In the alternative, HRSI argued that plaintiffs could not recover anything beyond nominal damages.

A.     Echo's Damages Were Not "Impossible of Ascertainment"

"Where claims for damages are premised on breaches of contracts, damages that are merely speculative, remote, imaginary, or impossible of ascertainment[] cannot be recovered." Colo. Nat. Bank of Denver v. Friedman, 846 P.2d 159, 174 (Colo. 1993) (internal quotations, citations, and alteration omitted). This rule is cited most frequently with respect to claims for lost profits. E.g., Western Cities Broad., Inc. v. Schueller, 849 P.2d 44, 47- (Colo. 1993) (vacating lost profits award based on testimony of "econometrician," an expert in "applying statistical and mathematical tools to" general economic data in order to "make predictions or forecast or attempt to examine economic behavior or what makes an economy tick," based on "six different hypothetical models"); Master Palletizer Sys., Inc.

v. T.S. Ragsdale Co., 725 F. Supp. 1525, 1535 (D. Colo. 1989) ("Lost profits are not recoverable if either the amount of the profit that would have been earned or the fact that the plaintiff would have earned them is too speculative, remote, imaginary, or impossible to ascertain.") (citing, inter alia, Prutch v. Ford Motor Co., 618 P.2d 657 (Colo. 1980)).  In this case, HRSI argues that there was no evidence of any pricing agreement after 1993.  That claim is not supported by the record.

The parties stipulated that between June 29, 1989, and January 7, 1995, HRSI made monthly merchant and insurance participation payments to EAC at the following rates:

- June 29, 1989 - December 7, 1990: merchant participation was paid at 8% and insurance participation at 30%;

- December 8, 1990 - August 7, 1993: merchant participation was paid at 5% and insurance participation at 30%;

- August 8, 1993 - October 7, 1993: merchant participation was paid at 7% and insurance participation at 30%;

- October 8, 1993 - January 7, 1995: merchant participation was paid at 10% and insurance participation at 30%.

J.A. 2353 (Tr. at 334-35).  Throughout this time period, merchant participation payments were calculated by multiplying the applicable rate by the finance charges billed on the total outstanding balance of all loans within the EAC Portfolio.  Id. at 2353-54 (Tr. at 335-36).  Similarly, insurance participation

payments were calculated by multiplying the applicable rate by the total insurance charges billed on all loans within the EAC Portfolio. Id. at 2354 (Tr. at 336).

Not every "pricing letter" between Echo and HRSI set forth specific numbers. The 1992 pricing letter, for example, merely confirmed that there would be no change in the parties' existing arrangement. J.A. 3028 (Pl. Ex. 33); see also id. at 2468-69 (Tr. at 710-14) (testimony of Frank Nardi, acknowledging Pl. Ex. 33 as pricing letter). Similarly, HRSI's letter dated January 12, 1994, noticing its intent to terminate the MFA, failed to enumerate any specific numbers in connection with its pledge to honor its current participation commitment. Specifically, the January 1994 letter promised that HRSI would "continue to provide [EAC] with the same quality service until May 1, 1994 under our existing agreement and honor our current participation commitment." Id. at 3033 (Pl. Ex. 51) (emphasis added). A reasonable jury could have read the foregoing sentence as evidencing two separate agreements, only one of which was to expire on May 1, 1994. In our view, the jury was entitled to interpret the January 1994 letter as a dual promise by HRSI: first, to continue to purchase Contracts and Slips through May 1, 1994; and second, to "honor [its] current participation commitment" – i.e., to pay 10% merchant and 30% insurance participation – through the life of each revolving credit contract. There are no doubt alternative ways to read this and subsequent letters from HRSI. Yet the ultimate question

presented in HRSI's Rule 50 motion was whether the facts were so clear that the law _required_ the entry of judgment in HRSI's favor.  See _Weisgram v. Marley Co._, 528 U.S. 440, 448 (2000).  In this case, the facts were far from clear, and the court was correct in submitting the case to the jury.

Nor do we agree that the evidence was insufficient to support an actual damages award.  In their constitutional capacity as triers of fact, jurors are necessarily required to resolve close factual questions to the best of their ability.  Obviously, not every evidentiary uncertainty renders a damage award impermissibly speculative.  See, e.g., _Bohrer v. Church Mut. Ins. Co._, 965 P.2d 1258, 1267 (Colo. 1998) ("[W]e instruct jurors to 'use [their] best judgment based on the evidence' when uncertainty arises regarding the amount of damages to be awarded.").  Indeed, Colorado courts have consistently held that "once the fact of damage has been established with the requisite degree of certainty, uncertainty as to the amount of damages will not bar recovery." _Tull v. Gundersons, Inc._, 709 P.2d 940, 943 (Colo. 1985); _accord_ _Western Cities Broad._, 849 P.2d at 48.  It is equally well-established that "a plaintiff will not be barred from recovery for failing to prove the amount of loss with mathematical certainty . . . ." _Pomeranz v. McDonald's Corp_, 843 P.2d 1378, 1382 (Colo. 1993).  Thus, in light of the evidence recited above, we hold that the court properly denied HRSI's motion for judgment as a matter of law.

B.    Nominal Damages

To recover an award beyond "nominal damages for breach of contract a plaintiff must prove that he suffered a loss resulting from the defendant's actions." Isaac v. American Heritage Bank and Trust Co., 675 P.2d 742, 745 (Colo. 1984); see also Doyle v. McBee, 420 P.2d 247, 250 (Colo. 1966) ("[I]n an action for breach of contract, only nominal damages can be recovered, if there is no evidence produced from which the facts necessary to determine the damages under the proper rule can be determined."). Because there is no question that the plaintiffs in this case made the threshold showing required to obtain damages in excess of nominal damages, the court did not err in refusing to limit Echo's recovery.

IV.    Alleged Trial Errors

The trial errors alleged by HRSI are as follows: (1) the court's "midstream" determination that the jury would only decide the applicable rates of post-termination payments, not the total monetary amount of damages; (2) the preliminary instruction's reference to HRSI's liability; (3) Instruction 15's reference to course of performance evidence; (4) the multiple choice format of the special verdict form; (5) the court's rejection of various instructions tendered by HRSI; and (6) the exclusion of three defense exhibits on hearsay grounds. We reject each assignment of error.

- 25 -

A.    Court's Determination that Jury Would Only Decide Rate of Post-
         Termination Merchant Participation and Insurance Percentage

HRSI claims that "[l]ate in the plaintiff's case and without adequate prior notice, the District Court restructured the trial to withdraw certain damages issues from the jury." Aplt. Br. at 44. According to the defendant, its trial strategy was based on its belief that the jury would not only consider the applicable rate of post-termination payments, but also the total amount of damages. Id. On the contrary, we find that the court's plan never changed. From the entry of summary judgment on March 2, 1999, it was clear to all parties that the only issues left for the jury were the applicable rates of merchant and insurance participation. See, e.g., J.A 1913 & n.1 (summary judgment order: characterizing jury issue as "which was the last pricing letter from Defendant to which the parties agreed," and noting "that the present record would not support a jury determination of Plaintiff's damages at less than the 5% rate"); id. at 2248 (Tr. at 62-63) (court's Statement of the Case, read to venire members during voir dire on July 26, 1999: "There is a question of fact in this case appropriately decided by you, the jury regarding which was the applicable pricing letter for purposes of calculating plaintiffs' share."); id. at 2344 (Tr. at 296) (statement by court during the cross-examination of Echo's first witness on July 27, 1999: "[T]here's only one limited purpose for which this jury is going to sit. They're going to decide what the rate is, period."). At the pretrial motions hearing on July 26, 1999, defense counsel

- 26 -

himself proposed that the court's Statement of the Case be modified to state that the court "found that the obligation continue[d] but that <u>the issue as to the rate, if any, of that obligation is for the jury to decide</u>." Id. at 2234 (Tr. at 5) (emphasis added). In short, HRSI's professions of "surprise" when the court reiterated its position two days later is flatly contradicted by the record.

B.    <u>Jury Instructions: Preliminary Instruction (Statement of the Case) and Instruction 15</u>

HRSI claims that the district court's Statement of the Case "deprived [it] of the right to a fair and impartial jury" by: (1) stating that HRSI had breached the contract, thereby casting the defendant as "a wrongdoer from the outset," (2) failing to state that the "plaintiffs had the burden to prove their damages," and (3) "improperly suggest[ing] that plaintiffs were entitled to some amount of actual damages." Aplt. Br. at 51. HRSI also objects to Instruction 15's failure to reference certain defense theories, and to its implicit reliance on "course of performance" evidence for the proposition that the rate at which post-termination payments should be calculated was the rate set forth in the "last (most recent) agreed pricing letter concerning participation . . . ." Id. at 51-52. "When considering a party's challenge to jury instructions, our initial inquiry is whether the party properly preserved that issue for appeal by objecting at the district court level to the instruction on the same grounds raised on appeal." Comcoa, Inc. v. NEC Tel., Inc., 931 F.2d 655, 660 (10th Cir. 1991). This inquiry is mandated by

Rule 51 of the Federal Rules of Civil Procedure, which provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51.

Although the defendant did raise a number of objections to the court's proposed Statement of the Case, see J.A. 2233-35 (Tr. at 4-11); id. at 2276 (Tr. at 173), its current objections were not among them.[8] Similarly, while HRSI did raise its current objections to Instruction 15 at the penultimate charge conference, id. at 2446-50 (Tr. at 620-38), it failed to do so the following day at the final instruction conference. Id. at 2529 (Tr. at 808-09). At the final conference, HRSI requested only two changes to the court's revised Instruction 15, both of which the court agreed to make. Id. Upon inquiry, HRSI stated that it had no additional objections to the court's proposed Instruction 15. Id. (Tr. at 809). Accordingly, HRSI waived its current objections to the Statement of the Case and to Instruction 15, and we find no plain error.

---

[8] But cf. J.A. 2267 (Tr. at 138) (voir dire by defense counsel: "[Y]ou've heard from the judge that he made a finding that my client breached the contract and that we're here now to determine matters pertaining to damages. So the first thing I need to know . . . is whether there's anybody here who somehow feels predisposed to award damages against my client because of anything you heard the judge say about this case?").

C.    Special Verdict Form

Next, HRSI objects to the Special Verdict form, claiming that it "left the jury with no choice but to find a single rate of merchant participation applicable during the entire damages period to all balances in the EAC portfolio, thereby [] depriving HRSI of its right to have its positions considered on the issue of rates." Aplt. Br. at 52.  We view this objection as including two components: (1) that the verdict form forced the jury to select one of the three rates given, and (2) that the verdict form did not permit the jury to consider whether different rates might apply to different accounts.  Both are without merit.  See Webb v. ABF Freight System, Inc., 155 F.3d 1230, 1249 (10th Cir. 1998) (noting that the language of a special verdict form is reviewed under the "same abuse of discretion standard that we apply to jury instructions").  First, the Special Verdict form consisted of three nearly identical questions, which differed only in terms of the merchant participation percentage:  "Has the Plaintiff proven by a preponderance of the evidence, that the applicable merchant participation rate was 10% [or 7%, or 5%] and the applicable insurance participation rate was 30%, as agreed upon by the parties and evidenced by a letter from Defendant?  (Yes or No)."  J.A. 2523-24 (emphasis added).  Nothing in the Special Verdict form prevented the jury from answering "No" to all three questions.

As to the court's determination that a single rate applied to all outstanding

- 29 -

loans, it is important to note the parties' stipulation that "HRSI calculated merchant participation payments to EAC by multiplying the agreed-upon rate in effect at the time by the finance charges billed on the total outstanding balance of the loans within the portfolio." J.A. 2613, ¶ 13; see also id. at ¶ 14 (comparable stipulation as to insurance participation payments). We recognize that the stipulation refers only to past practice, but the trial court was legally entitled to rely on the stipulation in order to eliminate any possible ambiguity as to the appropriate method of calculating post-termination payments. Under Colorado law, "[w]hen a contract or agreement has been given a practical construction, as reflected by the conduct and acts of the parties in its performance, such construction may, and perhaps even should, be considered by the court in eliminating any ambiguity, and in ascertaining the mutual meaning of the parties at the time of contracting." Pepcol, 687 P.2d at 1314 (internal quotations and citation omitted); see also KN Energy, 698 P.2d at 779 ("The parties' course of performance following execution of the contract is [] relevant to the interpretation of the agreement.") (citations omitted). The elimination of contractual ambiguity is a matter for the trial court, not for the jury. Pepcol, 687 P.2d at 1313 ("Whether an ambiguity exists is [] a question of law."). We find no error in the court's legal determination that the MFA and incorporated pricing letters required that all payments (both pre- and post-termination) by HRSI to EAC be calculated

by applying a single participation rate to the entire portfolio, regardless of the dates on which the individual loans originated.

D.      Rejection of Defendant's Tendered Instructions

HRSI also complains that the district court erred in refusing to give:

- Defendant's Proposed Instructions 2 and 3, J.A. 2508-09, requiring the jury to "award only nominal damages" if it found that the parties had failed to agree on merchant participation or insurance participation rates for any period of time;

- Defendant's Proposed Instructions 5-7, id. at 2511-13, regarding contract formation;

- Defendant's Proposed Instruction 9, Aplt. Br., Ex. E (copy of J.A. 2297[9]), stating that "[o]nce agreed upon, the terms of an agreement on participation under the Merchandise Financing Agreement may be changed only by a subsequent amendment between HRSI and EAC, which is evidenced by a letter from HRSI;"

- Defendant's Proposed Instruction 13, Aplt. Br., Ex. E (copy of J.A. 2306[10]), regarding the use of extrinsic evidence; and

- Defendant's Proposed Instruction No. 16, J.A. 2500, regarding HRSI's lack of consideration defense.

Aplt. Br. at 52-54.

---

[9] In the record, the copy of Defendant's proposed instruction regarding amendments is not numbered, indicating that HRSI added the number later for the sake of clarity on appeal. Compare J.A. 2297 (unnumbered instruction regarding "Amendments"); with Aplt. Br., Att. E (purporting to excerpt J.A. 2297, but including number "9").

[10] As with Proposed Instruction 9, see supra note 9, Defendant's proposed instruction regarding extrinsic evidence is not numbered in the record. Compare J.A. 2306; with Aplt. Br., Att. E (purporting to excerpt J.A. 2306).

- 31 -

"[I]t is not error to refuse to give a requested instruction if the same subject matter is adequately covered in the general instructions." F.D.I.C. v. Schuchmann, 235 F.3d 1217, 1222 (10th Cir. 2000) (internal quotations, citations, and alteration omitted). As to Proposed Instructions 2 and 3, we have already explained that nothing in the Special Verdict form required the jury to find that the parties had agreed to applicable rates. See supra Section III(C). The subject matter of Defendant's Proposed Instructions 5-7 – i.e., how to determine the parties' agreement as to post-termination participation rates – was adequately addressed in the court's Instruction 15, which required the jury to determine "which was the last pricing letter from the Defendant to which the parties agreed," J.A. 2626, as required by the MFA. Id. at 3006 (Pl. Ex. 3); see also J.A. 2523 (Special Verdict Form, requiring jury to find that the applicable rates were "agreed upon by the parties and evidenced by a letter from Defendant"). Instruction 15 and the Special Verdict Form also adequately addressed the subject matter of Defendant's Proposed Instructions 9 and 13: the requirement of the MFA. Finally, given that the court's summary judgment order had already rejected HRSI's lack of consideration argument as a matter of law by finding that post-termination payments were part of the price of the Contracts and Slips assigned to HRSI, the court did not err in rejecting Defendant's Proposed Instruction 16, which attempted to resurrect that theory at trial. In sum, we find

no error in the court's rejection of Defendant's Proposed Instructions 2-3, 5-7, 9, 13, and 16.

E.      Exclusion of Defense Exhibits 21, 23, and 25

Finally, HRSI claims that the district court erred in sustaining Echo's hearsay objections to the admission of three 1994 letters from HRSI. In its opening brief to this court, HRSI claims that the letters were not offered for the truth of the matter asserted, but rather: (1) as verbal acts with independent legal significance, (2) to provide context for various letters that had already been admitted, and (3) to show notice "of HRSI's position." HRSI also claims that the letters were admissible as business records.[11] Evidentiary rulings are reviewed for abuse of discretion. General Elec. Co. v. Joiner, 522 U.S. 136, 141-42 (1997). We see no abuse of discretion here.

1.      Non-Hearsay: Verbal Acts

The Federal Rules of Evidence define "hearsay" as an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed. R.

---

[11] HRSI's fifth argument, that the letters were admissible to show its state of mind, was never raised to the district court and is therefore waived. United States v. Barbee, 968 F.2d 1026, 1031 (10th Cir. 1992) ("Where a party has shifted his position on appeal and advances arguments available but not presented to the trial court and where a party has had ample opportunity to make the point in the trial court in a timely manner the issue will not be entertained on appeal.") (internal quotations and citations omitted).

Evid. 801(c). By contrast, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801 advisory committee's note (1972). According to HRSI, the excluded exhibits were not proffered as evidence of the truth of the statements therein, but rather, for their independent legal significance. Aplt. Br. at 54-56. Specifically, HRSI claims that defense exhibits 21, 23, and 25 were offers, and therefore admissible as verbals acts. We disagree.

The verbal acts doctrine applies only where the out-of-court statement actually "affects the legal rights of the parties, or where 'legal consequences flow from the fact that the words were said.'" U.S. v. Pungitore, 965 F. Supp. 666, 673 n.1 (E.D. Pa. 1997) (quoting Black's Law Dictionary 1558 (6th ed. 1990)). Thus, it is not enough to simply characterize a statement as an offer. Only "utterances by the parties . . . constituting the offer and acceptance which brought the contract into being" qualify as verbal acts. McCormick on Evidence § 249 (5th ed. 1999) (emphasis added). In this case, HRSI candidly acknowledges that EAC rejected the "offers" contained in defense exhibits 21 and 23 (dated March 28, 1994, and April 27, 1994, respectively). Aplt. Reply Br. at 29-30 (citing J.A. 3001, 3003). Similarly, there is no evidence that EAC or Echosphere ever accepted the "offer" contained in defense exhibit 25, dated April 29, 1994, which

- 34 -

appears to have been superseded on December 19, 1994 (if not earlier), by a subsequent HRSI letter. J.A. 3005 (Def. Ex. 26). Accordingly, it is clear that none of the excluded exhibits "brought the contract into being," McCormick § 249, "affect[ed] the legal rights of the parties," Pungitore, 965 F. Supp. at 673 n.1, or had any legal consequences independent of its substantive content. Compare United States v. Montana, 199 F.3d 947, 950 (7th Cir. 1999) (explaining difference between verbal acts such as "a promise, offer, or demand," which "commit the speaker to a course of action," and hearsay statements, which "narrate, describe, or otherwise convey information, and so are judged by their truth value") (emphasis added), and Trepel v. Roadway Exp., Inc., 194 F.3d 708, 717 (6th Cir. 1999) (upholding exclusion of statement as hearsay where statement "was not an offer to sell" but rather, a declaration of the price range the owner "would be willing to take . . . should someone make an offer to buy"); with Puma v. Sullivan, 746 A.2d 871, 874-76 (D.C. 2000) (holding that oral statement containing an offer, which statement's proponents had accepted, was admissible for consideration on summary judgment as a "verbal act"). The district court did not abuse its discretion by sustaining Echo's hearsay objection against HRSI's proffer of the exhibits as verbal acts.

  2.    Non-Hearsay: Context/Completeness

Given our standard of review, HRSI's argument that the excluded exhibits

were admissible to provide context is also unpersuasive. The trial court was familiar with the evidence in this case, and we decline to second-guess its judgment as to whether the excluded exhibits were necessary to provide context or completeness. See, e.g., VII Wigmore on Evidence § 2104 (1978 ed.); United States v. Catano, 65 F.3d 219, 225 (1st Cir. 1995). The case upon which HRSI relies, United States v. Catano, arose on very different facts. Because the question of whether a document is necessary to put another in context "will depend upon the circumstances of each case and the character of each document," factually distinct cases have minimal persuasive value, if any. VII Wigmore on Evidence § 2104. Unlike the written correspondence at issue here, Catano involved an audio tape of oral conversations between a criminal defendant and an informant. 65 F.3d at 224-25. In that case, the court held that the informant's portions of the conversations were admissible to provide context for the defendant's portions because they "served as reciprocal and integrated utterance(s), reasonably required to place [the defendant's] admissions into context and make them intelligible to the jury." Id. at 225 (internal quotations and citations omitted); see also, e.g., United States v. McDowell, 918 F.2d 1004, 1007 (1st Cir. 1990) ("Nor can a defendant, having made admissions, keep from the jury other segments of the discussion reasonably required to place those admissions into context."); United States v. Gutierrez-Chavez, 842 F.2d 77, 81

(5th Cir. 1988) (holding that statements on tape recording were admissible "for the limited purpose of putting the responses of the [defendant] in context and making them intelligible to the jury and recognizable as admissions") (internal quotations and citation omitted). The "intelligibility" difference between a recorded conversation that has been edited to omit every other line (as in Catano, McDowell, and Gutierrez-Chavez) and selected pieces of business correspondence (as in the instant case), is obvious. We find no abuse of discretion in the trial court's ruling.

Further, the exhibits that HRSI seeks to put in context were either stipulated exhibits, see J.A. 2315 (Tr. at 182-83) (Pl. Ex. 51), or introduced by HRSI itself. See id. at 2395 (Tr. at 484) (Def. Ex. 19); id. at 2403 (Tr. at 515-16) (Def. Ex. 22); id. at 2480 (Tr. at 758-59) (Def. Ex. 24). In HRSI's view, the circumstances under which the exhibits were admitted are irrelevant to its allegedly absolute right to introduce otherwise inadmissible hearsay in order to provide context. Aplt. Reply Br. at 31 ("No such limitation exists in the Federal Rules of Evidence. A party is entitled to put into context any and all evidence."). This assertion is patently incorrect.

The rule of completeness provides that "the opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the

total tenor and effect of the utterance." Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171 (1988) (citation omitted, emphasis added); see also Fed. R. Evid. 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.") (emphasis added).  The rule of completeness, both at common law and as partially codified in Rule 106, functions as a defensive shield against potentially misleading evidence proffered by an opposing party.  See United States v. Collicott, 92 F.3d 973, 981 n.9 (9th Cir. 1996) ("Only if the evidence by one party needs to be met or explained away by the other side does its mere introduction provide independent warrant for the introduction of other evidence.") (quoting J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 106[02] at 106-18 (1986)); United States v. Corrigan, 168 F.2d 641, 645 (2d Cir. 1948) ("The rule is protective, merely.  It goes only so far as is necessary to shield a party from adverse inferences . . . .") (internal quotations, citation, and alteration omitted).  The rule does not allow a party to introduce otherwise inadmissible hearsay on the coattails of its own or stipulated exhibits.[12]  "[I]f evidence is

_____

[12] Even if HRSI was entitled to invoke the rule of completeness, it is not clear whether the rule trumps the prohibition on hearsay statements.  See Rainey, 488 U.S. at 173 n.18 (avoiding the question); United States v. Pendas-Martinez, 845 F.2d 938, 944 & n.10 (11th Cir. 1988) ("[T]here are conflicting Circuit Court decisions on whether [Rule 106] makes admissible parts of a document that

misleading in a way that harms the case of the proponent, he can cure this by not introducing it." 21 Charles Alan Wright & Kenneth W. Graham, Fed. Practice & Procedure § 5076, at 362 (1977). Accordingly, the circumstances under which Pl. Ex. 51 and Def. Ex. 19, 22, and 24 were admitted are critical to HRSI's standing to invoke the rule of completeness. We find no abuse of discretion in the trial court's rejection of HRSI's proffers on completeness grounds.

### 3. Non-Hearsay: Notice

HRSI's final "non-hearsay" argument is that the excluded letters were admissible to show "notice from HRSI advising plaintiffs of HRSI's position." Aplt. Br. at 55. It is true that an out-of-court statement may be admitted over a hearsay objection if the statement is offered not for the truth of the matter asserted in the statement but merely to show that a party had knowledge of a material fact or issue. E.g., Marsee v. U.S. Tobacco Co., 866 F.2d 319, 325 (10th Cir. 1989) (ruling, in product liability action, that articles regarding health problems associated with "smokeless tobacco" were not hearsay because they

---

otherwise would be inadmissible under the Rules of Evidence . . . .") (collecting cases); I Hon. Joseph M. McLaughlin, Hon. Jack B. Weinstein, & Margaret A. Berger, Weinstein's Fed. Evidence § 106.03[1], at 106-15 (2d ed. 2001) (noting that language of Rule 106 is ambiguous as to "whether it authorizes the admission of otherwise inadmissible evidence"); cf. 21 Charles Alan Wright & Kenneth W. Graham, Jr., Fed. Practice & Procedure § 5071, at 337-40 (West 1977) (noting Congress' failure to take any action in response to the Justice Department's request that a clause be added to Rule 106 to require "that evidence adduced under the Rule be otherwise admissible").

"were not admitted to prove the truth of the matter asserted," but only "on the issue of whether the defendant had notice of the potential dangers its product posed to consumers"); Benford v. Richards Med. Co., 792 F.2d 1537, 1540 (11th Cir. 1986) (sustaining admission of deposition testimony that deponent heard defendant-manufacturer's former president advise current representative against use of cast stainless steel in product because testimony was offered to show notice of associated dangers, not for the truth of the matter asserted). We believe that doctrine is inapplicable in this case. HRSI's entire notice argument comprises only a sentence fragment in its opening brief; it is not referenced at all in the reply brief. Aplt. Br. at 55. Without further development, we fail to see the relevance of whether or not Echo had notice of "HRSI's position" on March 28, April 27, or April 29, 1994. Cf. Craven v. Univ. of Colo. Hosp. Auth., --- F.3d ---, ---, No. 99-1519, 2001 WL 909203, at *4 (10th Cir. Aug. 13, 2001) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review.") (internal citation omitted); Adler, 144 F.3d at 679 ("Arguments inadequately briefed in the opening brief are waived . . . ."). Accordingly, we conclude that the district court did not abuse its discretion in rejecting notice as a basis to admit the exhibits at issue.

### 4. Rule 803(6): Business Records Exception

The district court also rejected HRSI's proffer of the letters under the business records exception to the hearsay rule. See Fed. R. Evid. 803(6). The court determined that the letters constituted legal "posturing," drafted by lawyers in anticipation of litigation, and that Rule 803(6) was therefore inapplicable. J.A. 2399 (Tr. at 497-98) (Def. Ex. 21); see also id. at 2480 (Tr. at 758) (Def. Ex. 23); id. at 2481 (Tr. at 763) (Def. Ex. 25). Rule 803(6) "requires that the custodian or other qualified witness testify that (1) the records were made contemporaneously with the events and 'kept in the course of a regularly conducted business activity,' and (2) 'it was the regular practice of that business activity to make the [record].'" United States v. Samaniego, 187 F.3d 1222, 1224 (10th Cir. 1999) (quoting Fed. R. Evid. 803(6)) (footnote omitted). Business records are inadmissible, however, where "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6) (emphasis added); see also id. advisory committee notes (1972) (describing rationale underlying exception as "[t]he element of unusual reliability . . . said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation") (citation omitted). Thus, the motivation of a record's author is relevant to admissibility. Id.

Not every item of business correspondence constitutes a business record. See, e.g., Breeden v. ABF Freight System, Inc., 115 F.3d 749, 754 (10th Cir. 1997) (sustaining exclusion of letter from chiropractor proffered as "medical business record"); Timberlake Const. Co. v. U.S. Fidelity & Guar. Co., 71 F.3d 335, 342 (10th Cir. 1995) (holding that court erred in admitting letters "written in anticipation of litigation" as business records). "It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business." Timberlake, 71 F.3d at 342 (citing Palmer v. Hoffman, 318 U.S. 109, 114 (1943); Fed. R. Evid. 803(6) advisory committee's note); see also Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 204 n.2 (4th Cir. 2000) (noting that documents "prepared in view of litigation[] are not admissible as business records under Rule 803(6) and illustrate . . . that such documents prepared specifically for use in litigation are 'dripping with motivations to misrepresent'") (citing Hoffman v. Palmer, 129 F.2d 976, 991 (2d Cir. 1942)); Noble v. Ala. Dep't of Envtl. Mgmt., 872 F.2d 361, 366 (11th Cir. 1989) (holding that court erred in admitting letter as business record where "testimony was not adequate to establish that the letter was compiled as a matter of regular practice, as opposed to one prepared in anticipation of litigation"). Upon a thorough review of the exhibits and the testimony surrounding their proffer, we have found nothing to satisfy the foundational requirement that they

were "kept in the course of a regularly conducted business activity." Fed. R. Evid. 803(6). Like the letters we found inadmissible in Timberlake, the exhibits at issue in this case "have all the earmarks of being motivated and generated to further [HRSI's] interest, with litigation . . . not far around the corner." 71 F.3d at 342. We see no abuse of discretion in the court's refusal to admit defense exhibits 21, 23, and 25 as business records under Rule 803(6).

V.      Cross-Appeal as to Prejudgment Interest

The district court granted Echo's post-trial motion for prejudgment interest, awarding interest at a rate of eight percent per annum. J.A. 2887. "[I]n the interests of fairness," however, the court reduced the total interest award by one-third, noting that "Defendant's withholding was not wrongful for one-third of the prejudgment period due to the Court's substantial delay in ruling on the parties' cross motions for summary judgment." Id.; see also id. at 2982 (Order denying Echo's Rule 59(e) Motion). In its cross-appeal, Echo contends that the district court abused its discretion by reducing the total award and by failing to award interest at a rate higher than eight percent, the statutory minimum. Aplee. Br. at 19-26. Echo argues for a higher rate based upon HRSI's shareholders' overall, pre-tax return on equity or, in the alternative, HRSI's average yield on receivables.

As a preliminary matter, we must address HRSI's pending Motion to Strike

Plaintiffs' December 12, 2000 Reply Brief, filed December 19, 2000. As noted in that motion, Echo's Reply Brief addresses not only the cross-appeal, but also the merits of HRSI's appeal. Thus, Echo's Reply Brief effectively constitutes two briefs: (1) Cross-Appellant Echo's Reply Brief, and (2) Appellee Echo's Sur-Reply Brief. Only the first of the two is authorized by the Federal Rules of Appellate Procedure. Fed. R. App. P. 28(a)-(c) (providing that appellant may file an opening brief and a reply brief, that appellee may file an answer brief, and that "[u]nless the court permits, no further briefs may be filed"). If the latter portion of Echo's "Reply Brief" had been submitted to the Clerk of Court under the correct title, "Appellee's Sur-Reply Brief," it would not have been accepted for filing. See Fed. R. App. P. 28(c). Accordingly, HRSI's Motion to Strike is granted as to all portions of the brief that address the merits of HRSI's appeal.

We now turn to the merits of the cross-appeal. In pertinent part, the Colorado statute governing prejudgment interest in contract suits provides that:

(a)     When money or property has been wrongfully withheld, interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs; or, at the election of the claimant,

(b)     Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property after they are wrongfully withheld or after they become due to the date of payment or to the date judgment is entered, whichever first occurs.

Colo. Rev. Stat. § 5-12-102(1) (emphasis added). We refer to prejudgment

- 44 -

interest awarded pursuant to subsection (1)(a) as "moratory interest," see Chaparral Res., Inc. v. Monsanto Co., 849 F.2d 1286, 1291 n.4 (10th Cir. 1988), and interest awarded pursuant to (1)(b) as "statutory interest".

A.      Reduction of Statutory Interest Award

Where a party breaches a contract by failing to make required payments, the money owed under the contract has been "wrongfully withheld" for purposes of § 5-12-102(1)(a). Mesa Sand & Gravel Co. v. Landfill, Inc., 776 P.2d 362, 366 (Colo. 1989). Thus, Echo was entitled to receive prejudgment interest at a minimum of eight percent per annum. Ballow v. PHICO Ins. Co., 878 P.2d 672, 684 (Colo. 1994). Section 5-12-102 is not punitive in nature. Cf. Great Western Sugar Co. v. KN Energy, Inc., 778 P.2d 272, 276 (Colo. Ct. App. 1989). The statute merely "recognizes the time value of money" in order to "discourage a person responsible for payment of a claim to stall and delay payment until judgment or settlement." Mesa Sand & Gravel, 776 P.2d at 364. Regardless of the factors that contributed to the length of time during which prejudgment interest was accruing in this case, it is indisputable that HRSI retained Echo's money during that entire period. Under the plain language of § 5-12-102(1)(b), Echo is entitled to the time value of those funds during the period in which they were wrongfully withheld. Id. The Colorado General Assembly has adopted a rate of at least eight percent per annum, and the district court had no discretion to

- 45 -

modify the statute in that respect. We appreciate the district court's attempt to ameliorate the damages that could be perceived to have resulted from the delay, yet we are constrained by the statute. We hold that the court abused its discretion by reducing the statutory interest award, and that portion of the district court's judgment is hereby vacated.

B.    Denial of Moratory Interest Without an Evidentiary Hearing

The plaintiffs also contend that the court abused its discretion by rejecting their application for moratory interest without an evidentiary hearing. Aplee. Br. at 19; see also J.A. 2221 (statement by court during pre-trial status conference, indicating intent to have post-trial hearing on moratory interest). Echo claims that statutory interest is insufficient to "fully recognize[] the gain or benefit realized" by HRSI during the period in which payments were withheld. Aplee. Br. at 19 (quoting Colo. Rev. Stat. § 5-12-102(1)(a)).

"[I]n order to receive the higher interest rate," it is well-settled that "the claimant must specifically prove that the withholding party actually benefitted" in an amount greater than eight percent per annum. Northwest Cent. Pipeline Corp. v. JER Partnership, 943 F.2d 1219, 1229 (10th Cir. 1991) (emphasis added) (citing Lowell Staats Mining Co. v. Pioneer Uravan, Inc., 878 F.2d 1259, 1270-71 (10th Cir. 1989)). The statute's "specific proof" requirement is extremely demanding and, accordingly, moratory interest awards under § 5-12-102(1)(a) are

very rare.  <u>Atlantic Richfield Co. v. Farm Credit Bank of Wichita</u>, 226 F.3d 1138, 1159 (10th Cir. 2000).  <u>Compare</u> <u>Great Western Sugar</u>, 778 P.2d at 273-74, 275-76 (endorsing sophisticated economic model used to determine gain realized on the specific property withheld), <u>and</u> <u>Davis Cattle Co. v. Great Western Sugar Co.</u>, 393 F. Supp. 1165, 1194-95 (D. Colo. 1975) (finding sufficient specificity where claimant showed that the offending party "was able to leave $23-million of [its] credit line untapped" and thereby save 11.5% in interest), <u>aff'd</u>, 544 F.2d 436 (10th Cir. 1976); <u>with, e.g.</u>, <u>Atlantic Richfield</u>, 226 F.3d at 1158-59 (rejecting return on equity analysis as too speculative where underlying balance sheets failed to distinguish between corporate entities and were based, in part, on investments made outside the relevant time period), <u>and</u> <u>Ballow</u>, 878 P.2d at 683-84 (Colo. 1994) (vacating moratory interest award at 9.4%, the United States Treasury rate at the time, because "there [was] no evidence in the record to support [that] interest rate as the gain or benefit realized" by the defendant).

In support of its motion for moratory interest, <u>see</u> J.A. 2683-87, Echo submitted the following evidence:

(1)     HRSI's financial statements, <u>see</u> J.A. 2688-2700;

(2)     excerpts of deposition testimony by HRSI representative Joseph Hoff that a release of a reserve amount[13] would result in an increase in

---

[13] The record on appeal includes an internal document entitled "Reserve Definition," J.A. 3089 (Pl. Ex. 70), prepared by HRSI in March 1995 and

shareholders' equity because the amount of the reserve had previously served to reduce income, and calculating shareholders' average, pre-tax return on equity, see id. at 2713-18; and

(3)     an affidavit by Echo's expert witness, Steven Williams, explaining that "at a minimum . . . the economic benefit [HRSI] derived from the use of [wrongfully withheld funds] is commensurate with the yield [HRSI] was generating on [the EAC Portfolio]."

Aplee. Br. at 21.  Despite the plaintiffs' insistence that they have made the specific showing we found to be lacking in Atlantic Richfield, Aplee. Br. at 20-21, we see no meaningful distinction between the evidence in that case and the evidence presented to the district court in support of Echo's motion.  As in Atlantic Richfield, the evidence upon which Echo relied was of a general nature; the plaintiffs' arguments, like those that failed to persuade the Atlantic Richfield court, are entirely based on ratios derived from financial statements – i.e., the Average Return on Equity and Average Return on Receivables – without any specific proof as to how the withheld amounts were deployed.  Compare J.A.

_____

inadvertently produced to Echo during discovery.  Id. at 2421 (Tr. 585).  In Echo's view, the document indicates that "HRSI set up a reserve fund of 10% of billed finance charges in regard to EAC's claim."  Aplee. Br. at 21 n.1.  Notably, the Reserve Definition was never admitted into evidence, nor was it submitted in connection with the plaintiffs' motion for prejudgment interest.  Early in the proceedings, the court specifically noted its concerns regarding the Reserve Definition and instructed Plaintiffs' counsel not to refer to it in his opening statement.  J.A. 2315 (Tr. at 182).  After a discussion with counsel outside the presence of the jury, the court ruled that it would not receive the document into evidence.  Id. at 2421 (Tr. at 587).  As Echo's reference to the Reserve Definition in its opening brief makes no mention of this tortured history, we are compelled to remind counsel of their ongoing duty of candor to the court.

2685-86 (Echo's motion), and Aplee. Br. at 21-23; with Atlantic Richfield, 226 F.3d at 1158-59. Indeed, Echo's own expert noted his "understanding that [HRSI] did not escrow the[] withheld monies and such funds were commingled with the working capital of the corporation." J.A. 2729; cf. Atlantic Richfield, 226 F.3d at 1159 (recognizing that the specific proof requirement has the effect of permitting large corporate defendants to shield themselves "against claims for moratory interest simply by co-mingling funds with other corporate assets").

Echo not only failed to carry its own burden of proof under § 5-12-102(1)(a), see Chaparral Res., 849 F.2d at 1291 n.4, but also failed to respond to the evidence submitted by HRSI to contradict Echo's "forced investment" theory. Aplee. Br. at 22. That uncontroverted evidence showed that HRSI used the participation funds at issue to repay its debt and finance Echo's credit programs. J.A. 2830-34 (Hoff Aff.), 2841-45 (Hoff Dep.); see also id. at 2831, ¶ 5 ("HRSI operates its lending business . . . by borrowing money at one rate, from external sources, and then lending it at a higher rate. . . . The difference or spread between the finance charges received from customers and HRSI's borrowing costs is its gross profit."). Accordingly, the record indicates that the gain HRSI actually realized from the withheld funds was in the nature of six percent – the approximate rate at which HRSI borrowed money from external sources during the time period in question. Id. at 2834, ¶ 15.

Finally, Plaintiffs claim that the district court abused its discretion by denying their request for moratory interest on the basis of the documentary evidence alone, without conducting an evidentiary hearing. Aplee. Br. at 20. The only point at which Echo requested an evidentiary hearing on this issue was during a telephonic hearing on August 5, 1999. J.A. 2723 (Tr. at 18-19). During the August 5 hearing, counsel for Echo succinctly described the evidence to be presented at the moratory interest hearing: "We would only have one witness, and that would be Steve Williams and then the deposition offerings from the CEO of [HRSI], Joseph Hoff, as well as their financial statement." Id. (Tr. at 19) (emphasis added). The deposition excerpts and financial statements had already been submitted in support of Echo's motion, id. at 2688-2718; HRSI submitted additional financial statements and excerpts from Mr. Hoff's deposition in opposition to Echo's motion. Id. at 2835-45. As for Mr. Williams' testimony, Echo filed an affidavit which incorporated a letter by Mr. Williams to Mr. Moskowitz shortly after the telephonic hearing. Id. at 2725-30. Because all of the evidence that Echo sought to present at the evidentiary hearing had already been submitted for the court's consideration, the court did not abuse its discretion by rendering a decision on the basis of the documents alone. In sum, we see no error in the district court's refusal to award prejudgment interest in excess of the eight percent required by Colo. Rev. Stat. § 5-12-102(1)(b).

## Conclusion

The district court's judgment is REVERSED as to the one-third reduction of the pre-judgment interest award, AFFIRMED in all other respects, and REMANDED to the district court for proceedings consistent with this opinion.