**Carolyn POLLARD, Individually and on Behalf of All Others Similarly Situated, Plaintiff,**

v.

**ETS PC, INC., formerly known as Eberl's Temporary Services, Inc., ECS PC, Inc., formerly known as Eberl's Claim Service, Inc., EAC PC, LLC, formerly known as Eberl's Acquisition Co., LLC, ETS Holding Company, Inc., Kirk J. Eberl, Defendants.**

Civil Action No. 16-cv-0097-WJM-MJW

United States District Court,
D. Colorado.

Signed May 12, 2016

Amber L. Karns, April L. Walter, Megan M. Mitchell, Michael Allen Starzyk, Starzyk & Associates, P.C., The Woodlands, TX, for Plaintiff.

Jennifer Lynn Anderson, Jones Walker LLP, Baton Rouge, LA, John D. Martin, Martin & Hyman, LLC, Bradford J. Williams, John M. Husband, Holland & Hart, LLP, Denver, CO, Charles Michael Poplstein, Thompson Coburn, LLP, St. Louis, MO, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS ALL CLAIMS

William J. Martínez, United States District Judge

This is an action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Plaintiff Carolyn Pollard and those who have opted in to this action ("Plaintiffs") claim that Defendants failed to pay proper overtime compensation. (ECF No. 1.)

Currently before the Court is Defendants' Motion to Compel Arbitration and Dismiss All Claims ("Motion to Compel"). (ECF No. 67.) Defendants assert that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, requires all Plaintiffs to bring their claims in individual arbitrations, rather than through a class action lawsuit or class arbitration.

For the reasons explained below, the Court mostly agrees. The Court finds that Plaintiffs' claims are arbitrable, although certain provisions of their arbitration agreements must be severed. Moreover, the Court finds that Plaintiffs' claims must proceed in arbitration individually, not by way of any class or collective procedure. Accordingly, pursuant to the FAA, the Court will compel arbitration and stay this case, but not dismiss it. *See* 9 U.S.C. § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . ., the court . . . shall on application of one of the parties *stay* the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." (emphasis added)).

## I. LEGAL STANDARD

■ The FAA was enacted in response to judicial hostility to arbitration agreements. *See Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008). Section 2 of the FAA provides, in relevant part: "A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has described Section 2 "as reflecting both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (*"Concepcion"*) (internal quotation marks and citation omitted).

In this case, Plaintiffs do not argue that they did not sign a contract requiring arbitration. They also do not dispute that

their FLSA claims fall within the scope of what their arbitration agreements intended to cover. Thus, the only issue is whether those arbitration agreements are enforceable. If they are, the Court must compel the parties to arbitrate.

## II. BACKGROUND

### A. Plaintiffs' Relationship to Defendants

According to Plaintiffs, all Defendants operated as an essentially indistinguishable entity employing Plaintiffs as insurance adjusters. (ECF No. 1 ¶¶ 4–29, 51–71.) Plaintiffs claim that they regularly worked, but were not properly paid for, "20 to 44 hours of overtime per week." (*Id.* ¶¶ 72, 74.) "In fact," Plaintiffs say, "[they] worked so many overtime hours that several adjusters actually died while on the worksite ... because of the long hours and stressful working conditions." (*Id.* ¶ 73.)

Each Plaintiff at some point signed a "Temporary Employment Agreement" with Defendant ETS PC, Inc. (*See* ECF No. 67–2 at 1; ECF No. 67–4 at 1; ECF No. 67–6 at 1.) There are actually three versions of this agreement, which the Court will refer to as the "2012 Agreement," "2013 Agreement," and "2014 Agreement." Each of these Agreements is governed by Colorado law. (ECF No. 67–2 at 9–10, ¶ 3; ECF No. 67–4 at 9–10, ¶ 3; ECF No. 67–6 ¶ 14.) Moreover, each contains important provisions regarding arbitration, discussed next.

### B. 2012 Agreement

The 2012 Agreement's arbitration clause reads as follows:

> To the maximum extent permitted by law, the Parties agree and irrevocably

consent to resolve any dispute relating to or arising from contractual or statutory compensation paid or payable by ETS to Employee pursuant to this Agreement or any prior agreement between Employee and ETS through binding arbitration by the American Arbitration Association. Employee understands that this agreement to arbitrate all compensation disputes means Employee is agreeing to waive to the maximum extent permitted by law any right Employee may have to ask for a jury or court trial and to pursue claims on a class action or collective action basis in any compensation dispute with the Company. Any arbitration between us will be governed by the arbitrator's procedures or rules then in effect for employment disputes and will take place in Jefferson County, Colorado.

(ECF No. 67–2 at 9, ¶ 11(b).) Moreover, "[i]n addition to any relief, order or award entered, the prevailing Party in any arbitration or litigation between us will be awarded reasonable attorneys' fees, expert witness fees and costs." (ECF No. 67–2 at 9, ¶ 11(d).) [1]

The 2012 Agreement also contains a severability clause: "Any unenforceable provision of this Agreement will be modified to the extent necessary to make it enforceable or, if that is not possible, will be severed from this Agreement, and the remainder of this Agreement will be enforced to the fullest extent possible." (ECF No. 67–2 at 9–10, ¶ 3.)

### C. 2013 Agreement

The 2013 Agreement's arbitration clause is nearly identical to the 2012 Agreement's arbitration clause, but adds references to "affiliated companies":

---

1. This subparagraph is actually labeled "11(b)" rather than 11(d). That is an obvious typographical error.

To the maximum extent permitted by law, the Parties agree and irrevocably consent to resolve any dispute relating to or arising from contractual or statutory compensation paid or payable by ETS or its affiliated companies to Employee pursuant to this Agreement or any prior agreement between Employee and ETS or its affiliated companies through binding arbitration by the American Arbitration Association. Employee understands that this agreement to arbitrate all compensation disputes means Employee is agreeing to waive to the maximum extent permitted by law any right Employee may have to ask for a jury or court trial and to pursue claims on a class action or collective action basis in any compensation dispute with the Company or its affiliated companies. Any arbitration between us will be governed by the arbitrator's procedures or rules then in effect for employment disputes and will take place in Jefferson County, Colorado.

(ECF No. 67–4 at 9, ¶ 11(b).) The 2013 Agreement contains a fee-shifting clause and severability clause identical to those in the 2012 Agreement. (ECF No. 67–4 at 9–10, ¶¶ 3, 11(d).)[2]

**D. 2014 Agreement**

The 2014 Agreement's arbitration clause is more elaborate and precise than its predecessors:

To the maximum extent permitted by law, the Parties agree and irrevocably consent to resolve any disputes or claims arising under federal, state or local statutory or common law relating to or arising from the compensation paid or payable by ETS or its affiliated companies to Employee pursuant to this Agreement or any prior agreement between Employee and ETS or its affiliated companies through binding arbitration by the American Arbitration Association. Employee understands that this agreement to arbitrate all compensation disputes arising from or relating to this Agreement or any prior agreement between the Employee and ETS or its affiliated companies means Employee is agreeing to waive to the maximum extent permitted by law any right Employee may have to ask for a jury or court trial and that Employee is also agreeing to waive to the maximum extent permitted by law any right Employee may have to pursue claims on a class action or collective action basis in any compensation dispute with ETS or its affiliated companies arising from or relating to this Agreement or any prior agreement between Employee and ETS or its affiliated companies. Any arbitration between us will be governed by the American Arbitration Association's procedure and rules then in effect for employment disputes, except if a party asserts a claim pursuant to a federal, state or local statute or law which provides for a specific allocation or handling of attorney's fees and costs, then the Parties agree that recovery of attorneys' fees and/or costs shall be handled in accordance with the federal, state, or local statute or law governing the Party's claim notwithstanding anything to the contrary in the American Arbitration Association's rules and procedures. The arbitration will take place in Jefferson County, Colorado or the next closest county in Colorado where the American Arbitration Association has facilities to accommodate the arbitration. The Parties acknowledge that ETS and Employee are engaged in or affecting interstate

---

2. Like its counterpart in the 2012 Agreement, this subparagraph is erroneously labeled "11(b)" rather than 11(d).

commerce by the performance of their services under this Agreement and that this arbitration provision is governed by the Federal Arbitration Act.

(ECF No. 67–6 ¶ 10(b).)

Although the 2014 Agreement contains a fee-shifting clause, it is subject to qualifications not present in the 2012 or 2013 Agreements:

> In addition to any relief, order or award entered, if ETS is the prevailing Party in any arbitration or litigation between us, ETS will be awarded reasonable attorneys' fees, expert witness fees and costs, except if a Party asserts a claim pursuant to a federal, state or local statute or law which provides for a specific allocation or handling of attorneys' fees and costs, then the Parties agree that the recovery of attorneys' fees and/or costs shall be handled in accordance with the federal, state or local statute or law governing the Party's claim.

(ECF No. 67–6 ¶ 10(d).)

Similarly, the 2014 Agreement's severability clause is more specific:

> Any unenforceable provision of this Agreement will be modified to the extent necessary to make it enforceable or, if that is not possible, will be severed from this Agreement, and the remainder of this Agreement will be enforced to the fullest extent possible, including but not limited to, any modification necessary to ensure that the Parties' agreement to arbitrate compensation disputes survives and is enforced to the fullest and greatest extent possible.

(ECF No. 67–6 ¶ 14.)

Notably, although Plaintiffs challenge the overall enforceability of the 2012 and 2013 Agreements' arbitration clauses, Plaintiffs do not challenge the 2014 Agreement's arbitration clause. Plaintiffs only challenge the 2014 Agreement to the extent it prevents them from litigating as a class.

## III. GENERAL ARBITRATION ANALYSIS

Plaintiffs bring several challenges to the various Agreements. These can be best classified as challenges to arbitration generally, discussed in this Part, and challenges to their waiver of the right to proceed as a class, discussed in Part IV below.

### A. Nonsignatory Defendants

Plaintiffs point out that each version of the Agreement contains a subparagraph titled "Only ETS is Liable for Any Compensation" ("Sole Liability Clause"). (ECF No. 672 at 7, ¶ 8(m); ECF No. 67–4 at 7 ¶ 8(m); ECF No. 67–6 ¶ 8(j).) The Sole Liability Clause is identical in each of the three agreements:

> All services performed hereunder shall be rendered to and for the exclusive benefit of ETS. Therefore, Employee agrees to look solely to ETS for compensation that may be due Employee in connection with such services. Under *no circumstances* shall Employee seek compensation from any ETS client, a client's policyholder or anyone else in connection with such services. To the fullest extent permitted by law, Employee hereby expressly waives and releases any and all claims or rights Employee has or may in the future have to assert a lien or other remedy against any person or entity other than ETS arising from or connected with compensation which may be due Employee in connection with services performed by Employee pursuant to this Agreement.

(*Id.*) Plaintiffs argue that, through this provision, the parties have excluded any possibility of including the Nonsignatory Defendants within the various arbitration clauses. For various reasons, the Court finds that the claims against the Non-Signatory Defendants are arbitrable regardless of the Sole Liability Clause.

First, the 2013 and 2014 Agreements explicitly include "ETS or its affiliated companies" within their respective arbitration clauses. (ECF No. 67–4 at 9, ¶ 11(b); ECF No. 67–6 ¶ 10(b).) This is not inconsistent with the Sole Liability Clause. Under the arbitration clause, a dispute over compensation with an ETS-affiliated company would go to arbitration, and then the arbitrator could decide whether the Sole Liability Clause nullifies the plaintiff's claim against the affiliated company. Thus, with respect to the 2013 and 2014 Agreements, the arbitration clause itself encompasses ETS's affiliated companies, meaning that Plaintiffs who signed the 2013 or 2014 Agreement contractually obligated themselves to arbitrate compensation disputes with ETS itself, and with ECS, EAC, and ETS Holding Company. The Court will address Kirk Eberl separately below, considering that he is an individual and not an "affiliated company."

Second, Plaintiffs attempt to use the Sole Liability Clause as both a sword and a shield. On the one hand, they ask the Court to enforce the clause to avoid arbitration with the Non–Signatory Defendants. On the other hand, they later argue that the clause should be invalidated as an unenforceable waiver of the FLSA right to sue one's "employer," which the FLSA defines broadly to encompass more than just the nominal employer. (ECF No. 115 at 13.) As explained in Part III. C.2.b, below, the Court agrees with the latter argument and will strike the Sole Liability Clause to the extent it may insulate the Nonsignatory Defendants from FLSA liability as that statute defines "employer." Given that, the Court cannot in fairness continue to enforce the stricken clause against Defendants to prevent arbitration.

Third, even if the Court were not willing to strike the Sole Liability Clause in light of the FLSA's definition of "employer," the Court agrees with Defendants that Plaintiffs are equitably estopped from avoiding arbitration with the Nonsignatory Defendants. Contracts, including agreements to arbitrate, may "be enforced by or against nonparties to the contract through ... estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009) (internal quotation marks omitted). In cases such as this where contract rights arise out of state law, application of estoppel is likewise a matter of state law. *Id.* at 630–32, 129 S.Ct. 1896. Accordingly, this Court must "must follow the most recent decisions of the [relevant] state's highest court," and if no such decision exists, the Court

> must attempt to predict what the state's highest court would do. In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law.

*Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).

In a 2011 unpublished disposition, the Tenth Circuit noted that "[t]he Colorado Supreme Court has not addressed whether and under what circumstances equitable estoppel might apply to compel arbitration between a signatory and a nonsignatory." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 Fed.Appx. 704, 709 (10th Cir. 2011). In *Lenox*, the Tenth Circuit found "only one occasion" on which the Colorado Court of Appeals had "applied equitable estoppel to compel arbitration between a signatory and a nonsignatory," and in that case, *nonsignatory plaintiffs* were seeking to hold the *signatory defendant* liable under a contract containing an arbitration clause. *Id.* (citing *Smith v.*

*Multi–Fin. Sec. Corp.,* 171 P.3d 1267, 1273–74 (Colo.App.2007)). In other words, the nonsignatory plaintiffs sought the benefits of the contract and were therefore estopped from avoiding its burdens. The Tenth Circuit found no Colorado authority addressing another common application of estoppel, *i.e.,* where the *signatory plaintiffs* allege "substantially interdependent and concerted misconduct" between a *signatory defendant and nonsignatory defendants.* *Id.* The Tenth Circuit therefore went on to canvas authority from various jurisdictions, and ultimately concluded that

allegations of collusion between a signatory and a nonsignatory, alone, are not enough to estop a signatory from avoiding arbitration with a nonsignatory. Rather, allegations of collusion will support estoppel only when they establish that the claims against the nonsignatory are intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause.... The plaintiff's actual dependance on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel.

*Id.* at 710 (internal quotation marks and citations omitted).

The Colorado Court of Appeals has since decided *Meister v. Stout,* 353 P.3d 916 (Colo.App.2015), which squarely addresses the circumstances in which a nonsignatory defendant may estop a signatory plaintiff from avoiding arbitration. Meister held that Colorado estoppel law extends to, among other things, a situation where "a signatory alleges substantially interdependent and concerted misconduct by a non-

signatory and one or more signatories to the agreement. Application in this circumstance is limited to misconduct that is intertwined with duties or obligations arising from the underlying contract." *Id.* at 921 (citations omitted).[3]

Coming from the Colorado Court of Appeals, *Meister* does not bind this Court in predicting the scope of Colorado estoppel law. *See Wade,* 483 F.3d at 666. Nonetheless, *Meister* is the strongest data point currently available when predicting what the Colorado Supreme Court would hold on this topic. Moreover, the only potentially contrary authority cited by Plaintiffs is the Tenth Circuit's unpublished *Lenox* decision. (*See* ECF No. 115 at 4–5.) *Lenox,* of course, is not precedential, and also not contrary to *Meister.* *Lenox* avoids predicting whether the Colorado Supreme Court would endorse the theory adopted in *Meister* and instead holds that, if the theory is valid, it was inapplicable to the circumstances of that case. *Lenox,* 449 Fed. Appx. at 709–10. It does so by reaching essentially the same conclusion as *Meister* regarding the scope of estoppel: a party must allege interdependent misconduct connected to the contract containing the arbitration agreement, not interdependent misconduct generally. *Compare id. with Meister,* 353 P.3d at 921. Given all this, this Court predicts that the Colorado Supreme Court would adopt *Meister*'s holding that a plaintiff's allegations of "substantially interdependent and concerted misconduct by a nonsignatory and one or more signatories to the agreement" are grounds for estopping the plaintiff from avoiding arbitration if the allegations of misconduct are "intertwined with duties or

---

**3.** In endorsing this form of estoppel, *Meister* relied heavily on "a substantial body of case law" on this subject developed by federal courts. *Id.* at 920–21 & n. 3. But *Meister* explicitly acknowledged that estoppel is a matter of state law, not federal law, and therefore deemed these federal cases only "persuasive" when determining the scope of estoppel in Colorado. *Id.* at 920 n. 3.

obligations arising from the underlying contract." *Id.*

In this case, Plaintiffs allege interdependent and concerted misconduct. Indeed, in their Complaint, Plaintiffs describe the Defendants individually but then define the term "Defendants" to refer to all of them collectively, and go on to indiscriminately accuse "Defendants" of the various alleged violations at issue here. (ECF No. 1 ¶¶ 31–38, 49–120.) Accordingly, the only question is whether Plaintiffs' allegations are intertwined with duties or obligations arising from the 2012, 2013, or 2014 Agreements.

In this regard, Plaintiffs argue that they "seek to hold the nonsignatory Defendants liable for unpaid overtime owed under the FLSA, *not* for duties imposed by or owed pursuant to the [Agreements]." (ECF No. 115 at 5 (emphasis in original).) If the FLSA were a statute that entitled employees to additional compensation regardless of whether the employees have a contract with their employer, and regardless of the contract's terms, Plaintiffs would have a better argument. But the FLSA, although broad, is not that broad.

In this case, an arbitrator will need to examine and interpret the 2012, 2013, and/or 2014 Agreements to determine whether Plaintiffs' claims implicate or are affected by those Agreements. (See, e.g., ECF No. 1 ¶¶ 74–79; ECF No. 137 at 3, 14.) Thus, Plaintiffs' FLSA claims are intertwined with their employment agreements, and Plaintiffs are estopped from refusing to arbitrate with the Nonsignatory Defendants, including Defendant Kirk Eberl.

**B. Unconscionability.**

■ In a footnote, Plaintiffs argue that the 2012 and 2013 Agreements are unconscionable, making the arbitration clause unenforceable. (ECF No. 115 at 8 n.6.) Plaintiffs recite Colorado's unconscionabili-

ty standard and, without specifically applying the relevant factors, briefly argue that they "were subject to significant external pressure to sign the agreement without taking time to review them or have someone else review them." (*Id.*) Plaintiffs also refer to arguments found later in their brief that "the arbitration agreements do not contain standard terms that are substantively fair." (*Id.*)

■ At this stage, an unconscionability attack "must show that the Arbitration Agreement itself–and not the contract in general–is unconscionable and, therefore, unenforceable." *Bernal v. Burnett,* 793 F.Supp.2d 1280, 1285 (D.Colo.2011); *see also Nitro–Lift Techs., L.L.C. v. Howard,* — U.S. —, 133 S.Ct. 500, 503, 184 L.Ed.2d 328 (2012) ("it is a mainstay of the Act's substantive law that attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved by the arbitrator in the first instance, not by a federal or state court" (internal quotation marks omitted)). Plaintiffs' arguments are mostly directed at the contract in general. Plaintiffs do not develop any argument that the agreement to arbitrate is itself unconscionable. Accordingly, Plaintiffs have not properly presented an unconscionability attack, and the Court therefore deems Plaintiffs to have waived the question of whether any arbitration clause is unconscionable. *See Echo Acceptance Corp. v. Household Retail Servs.,* 267 F.3d 1068, 1077 n. 5 (10th Cir. 2001) ("arguments inadequately briefed in the opening brief are waived"); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.,* 131 F.3d 874, 880 n. 9 (10th Cir. 1997) (holding that party who noted an issue and made "several broad, conclusory statements" on appeal waived that issue for failure to develop it).

## C. "Effective Vindication"

██ "Federal courts have recognized what is referred to as the effective vindication exception to the FAA." *Nesbitt v. FCNH, Inc.,* 811 F.3d 371, 376–77 (10th Cir. 2016) (internal quotation marks omitted; alterations incorporated). The effective vindication exception holds that, although an arbitral forum is presumptively adequate to resolve statutory claims, that presumption "falls apart, however, if the terms of an arbitration agreement actually prevent an individual from effectively vindicating his or her statutory rights." *Shankle v. B–G Maint. Mgmt. of Colo., Inc.,* 163 F.3d 1230, 1234 (10th Cir. 1999).

### 1. *Fee–Shifting and Cost–Sharing*

██ By far, the most common examples· of arbitral provisions that thwart effective vindication of federal statutory rights, particularly FLSA rights, are those that impose prohibitive costs on the plaintiff (such as paying or splitting the arbitrator's fee), or that would hold the plaintiff liable for the defendant's attorneys' fees and costs if the plaintiff is unsuccessful. *See, e.g., Nesbitt,* 811 F.3d at 379–81; *Shankle,* 163 F.3d at 1234–35; *Brownlee v. Lithia Motors, Inc.,* 49 F.Supp.3d 875, 880–81 (D.Colo.2014); *Daugherty v. Encana Oil & Gas (USA), Inc.,* 2011 WL 2791338, at *11–12 (D.Colo. July 15, 2011). Plaintiffs point to portions of the 2012 and 2013 Agreements that, in their view, have these effects.

In a typical FLSA case, only a plaintiff may recover prevailing party attorneys' fees and costs. 29 U.S.C. § 216(b). Plaintiffs note that the 2012 and 2013 Agreements contain a clause that requires the losing party to pay the prevailing party's attorneys' fees and costs: "In addition to any relief, order or award entered, the prevailing Party in any arbitration or litigation between us will be awarded reasonable attorneys' fees, expert witness fees and costs." (ECF No. 67–2 at 9; ECF No. 67–4 at 9.) This fee-shifting clause contrasts with the analogous clause in the 2014 Agreement, which Plaintiffs do not challenge. Although the 2014 Agreement likewise shifts fees, it qualifies that obligation where "a Party asserts a claim pursuant to a federal, state or local statute or law which provides for a specific allocation or handling of attorneys' fees and costs," in which case "the recovery of attorneys' fees and/or costs shall be handled in accordance with the federal, state or local statute or law governing the Party's claim." (ECF No. 67–6 ¶ 10(d).)

██ Clauses which undermine the FLSA's award of fees to a prevailing employee interfere with employees' effective vindication of FLSA rights through arbitration. *Nesbitt,* 811 F.3d at 379–81 (invalidating arbitration clause requiring parties to bear their own attorneys' fees); *Daugherty,* 2011 WL 2791338, at *11–12 (invalidating fee-shifting clause). Defendants laudably concede as much and argue that this Court may sever these clauses from the 2012 and 2013 Agreements: "Defendants have no objection to the striking or modifying of the prevailing party provision for the FLSA claim." (ECF No. 137 at 9–10.) The Court will discuss the potential for severance below in Part III.D. For present purposes, the Court agrees that the fee-shifting clause in the 2012 and 2013 Agreements is a barrier to effective vindication of FLSA rights, and therefore unenforceable as to Plaintiffs' FLSA claims.

Defendants further concede that, if the fee-shifting clause is unenforceable, then the arbitrator could not require any plaintiff to bear or share the costs of arbitration, such as the arbitrator's fee. (ECF No. 137 at 11 ("If this Court strikes the prevailing party provision for purposes of the FLSA claim, then Plaintiffs' fees and costs for arbitration would be handled in

accordance with the FLSA.").) The Court takes Defendants at their word and accordingly need not separately analyze whether the potential for paying arbitration costs would interfere with effective vindication of FLSA rights.

### 2. *Other Alleged Obstacles to Effective Vindication*

■ In addition to cost-sharing and fee-shifting, Plaintiffs assert three other provisions in the various Agreements that allegedly interfere with their ability to effectively vindicate their FLSA rights:

1. a provision in the 2012 and 2013 Agreements that Plaintiffs interpret as an attempt to force them to waive any FLSA claims that might have accrued before signing those Agreements;

2. the Sole Liability Clause in all of the Agreements, which, according to Plaintiffs, prevents them from suing parties that the FLSA might otherwise deem liable; and

3. a provision in the 2012 and 2013 Agreements that purports to require compensation disputes to be brought within ninety days from the end of any particular assignment.

(ECF No. 115 at 12–14.)

Defendants argue that these are attacks on Agreement provisions outside of the arbitration clause, and are therefore matters for the arbitrator to decide. (*See* ECF No. 137 at 7 (citing *Nitro–Lift*, 133 S.Ct. at 503).) For the reasons explained below, the Court agrees with Defendants as to the first and third arguments outlined above, but not as to the second.

### a. *"To the Maximum Extent Permitted by Law"*

Plaintiffs' first and third arguments both rest on provisions in the 2012 and 2013 Agreements that begin with a qualifier regarding the "extent permitted by law." One such provision in the 2012 Agreement states that, "[t]o the maximum extent permitted by applicable law," an employee must give notice of a compensation dispute within ninety days of the date on which the dispute arose, and may not "pursue a claim, demand or other grievance" later than sixty days after Defendants responded to the employee's notice. (ECF No. 67–2 at 8.) The 2013 Agreement contains a similar provision, but establishes a ninety-day window rather than a sixty-day window. (ECF No. 67–4 at 8.) Plaintiffs argue that these provisions are invalid because the FLSA statute of limitations may not be shortened by contract. (ECF No. 115 at 14.)

Plaintiffs also point to portions of the 2012 and 2013 Agreements in which, "to the maximum extent permitted by law," they purportedly released any claims they may have had against Defendants predating those Agreements. (ECF No. 67–2 at 8; ECF No. 67–4 at 8.) Plaintiffs argue that these contract provisions are invalid because FLSA rights cannot be waived except through supervised settlement. (ECF No. 115 at 12.)

The Court finds that the "extent permitted by law" qualifiers in each of these provisions makes this a matter for an arbitrator to decide. If the law indeed does not permit shortening of the statute of limitations, or contractual waiver of FLSA claims, Plaintiffs may argue as much to the arbitrator, but this Court need not resolve those questions here. Accordingly, the Court sees no barrier to Plaintiffs' effective vindication on these grounds.

### b. *The Sole Liability Clause*

■ Plaintiffs' argument concerning the Sole Liability Clause stands on different footing. As noted in Part III.A, above, the Sole Liability Clause states that each employee will seek compensation only from ETS. It is worded broadly enough that it could apply to claims for compensation

from ETS's affiliates, such as the Nonsignatory Defendants. Notably, the Sole Liability Clause does not contain a "to the extent permitted by law" qualifier.

██ The Supreme Court recently held that the effective vindication exception "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights." *Am. Exp. Co. v. Italian Colors Rest.*, — U.S. —, 133 S.Ct. 2304, 2310, 186 L.Ed.2d 417 (2013) (*"Italian Colors"*). The Sole Liability Clause has this effect. The FLSA defines "employer" broadly, potentially including entities with whom the employee has no direct contractual relationship. *See, e.g.,* 29 C.F.R. § 791.2. Accordingly, to forbid an employee from seeking compensation from certain parties whom the FLSA might make liable is a form of "forbidding the assertion of certain statutory rights." *Italian Colors,* 133 S.Ct. at 2310. It is therefore unenforceable under the effective vindication exception.[4]

**D. Severability**

██ "Where a contract contains a 'severability' or 'savings' clause, void or otherwise unenforceable provisions may be severed from the contract." *Daugherty,* 2011 WL 2791338, at *12. That is the case here. The Court will therefore sever the portions of the 2012 and 2013 Agreements (and, to the extent applicable, the 2014 Agreement) that purport to impose fee– or cost-shifting obligations different from those established in 29 U.S.C. § 216(b), or purport to require that FLSA claims be brought solely against Defendant ETS PC, Inc.

## IV. COLLECTIVE ARBITRATION ANALYSIS

**A. Applicability**

Plaintiffs argue that the 2012 and 2013 Agreements "expressly contemplate" collective arbitration of compensation disputes. (ECF No. 115 at 15.) Plaintiffs rely on the following language from the arbitration clauses: "Employee is agreeing to waive to the maximum extent permitted by law any right Employee may have to ask for a jury or court trial and to pursue claims on a class action or collective action basis in any compensation dispute with the Company or its affiliated companies." (ECF No. 67–2 at 9; ECF No. 67–4 at 9.) Plaintiffs read this language as if it contained the word "instead" before the clause "to pursue claims on a class action or collective action basis," as if the employee is waiving the right to proceed individually on any claim and instead agreeing to pursue claims, if at all, through a class mechanism. Under this interpretation, Defendants have supposedly signaled their intent to permit class arbitration against them. (ECF No. 115 at 15.)

Perhaps sensing that this is a dubious reading, the very next section of Plaintiffs' brief discusses the ambiguity-construed-against-the-drafter canon of contract construction–although Plaintiffs coyly avoid any mention of what might actually be ambiguous. In any event, Plaintiffs ask this Court to declare that those of them subject to the 2012 and 2013 Agreements may proceed in arbitration collectively.

There is a difference between ambiguity and attorney nit-picking. Plaintiffs' argument rests on the latter more than the

---

4. To the extent Defendants argue that the Court should leave this question to the arbitrator because the Sole Liability Clause is not contained within the specific paragraph requiring arbitration, the argument fails. The effective vindication exception does not require supposedly offending language to appear in the precise subdivision of the contract that establishes the obligation to arbitrate. Any other holding would permit a party to subvert statutory rights simply through creative drafting.

former. But even if there was an ambiguity, recent Supreme Court decisions discussed below (Part IV.B.4) establish that no arbitration agreement may be said to embrace class arbitration without a clear statement to that effect. The language on which Plaintiffs rely is far from a clear statement agreeing to class arbitration. Thus, wherever else the ambiguity-construed-against-the-drafter canon may apply, it does not apply to force class arbitration in the face of, at best, ambiguous language addressing that possibility. The Court therefore rejects Plaintiffs' interpretation of this portion of the 2012 and 2013 Agreements.

## B. Enforceability: *D.R. Horton*

Plaintiffs see an unambiguous collective arbitration waiver in the 2014 Agreement: "Employee is also agreeing to waive to the maximum extent permitted by law any right Employee may have to pursue claims on a class action or collective action basis in any compensation dispute." (ECF No. 67–6 ¶ 10(b).) Plaintiffs argue that this clause is unenforceable because the National Labor Relations Board ("NLRB") held in 2012 that collective arbitration waivers violate the National Labor Relations Act ("NLRA"). *See In re D.R. Horton, Inc.*, 357 NLRB No. 184, 2012 WL 36274 (Jan. 3, 2012).

On this point, *D.R. Horton* was overturned on appeal to the Fifth Circuit. *See D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 355–62 (5th Cir. 2013); *see also Murphy Oil USA, Inc. v. NLRB*, 808 F.3d 1013 (5th Cir. 2015) (reaffirming its *D.R. Horton* opinion). With few exceptions,[5] courts in other jurisdictions have similarly concluded that the NLRB's *D.R. Horton* rule is invalid.[6] For the reasons explained below, this Court agrees with the majority view.

### 1. The NLRB's Reasoning

Similar to the present circumstances, the NLRB's *D.R. Horton* decision arose from an employee's attempt to bring a FLSA collective action in federal court despite an arbitration agreement requiring individual arbitration of employment disputes. *D.R. Horton*, 2012 WL 36274, at *1. When the employer moved to compel individual arbitration, the employee filed a charge with the NLRB, claiming that class or collective action waivers in arbitration agreements are an NLRA-prohibited unfair labor practice. *Id.* at *2. The NLRB sustained the charge, reasoning as follows:

1. The NLRA declares that "[e]mployees shall have the right to self-or-

---

**5.** *See Totten v. Kellogg Brown & Root, LLC*, 152 F.Supp.3d 1243, 1254–66, 2016 WL 316019, at *7–17 (C.D.Cal. Jan. 22, 2016); *Herrington v. Waterstone Mortg. Corp.*, 993 F.Supp.2d 940, 943–47 (W.D.Wis.2014) (refusing to reconsider prior unpublished decision); *Herrington v. Waterstone Mortg. Corp.*, 2012 WL 1242318, at *3–7 (W.D.Wis. Mar. 16, 2012).

**6.** *See, e.g., Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297 n. 8 (2d Cir. 2013); *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1052–55 (8th Cir. 2013); *Bell v. Ryan Transp. Serv., Inc.*, 176 F.Supp.3d 1251, 1260–63, 2016 WL 1298083, at *7–8 (D.Kan. Mar. 31, 2016); *Morvant v. P.F. Chang's China Bistro, Inc.*, 870 F.Supp.2d 831, 841–45 (N.D.Cal.2012);

*Jasso v. Money Mart Exp., Inc.*, 879 F.Supp.2d 1038, 1046–49 (N.D.Cal.2012); *Hickey v. Brinker Int'l Payroll Co., L.P.*, 2014 WL 622883, at *2 (D.Colo. Feb. 18, 2014); *Carey v. 24 Hour Fitness USA, Inc.*, 2012 WL 4754726, at *1–2 (S.D.Tex. Oct. 4, 2012); *Tenet HealthSystem Philadelphia, Inc. v. Rooney*, 2012 WL 3550496, at *2–4 (E.D.Pa. Aug. 17, 2012); *Spears v. Mid-Am. Waffles, Inc.*, 2012 WL 2568157, at *2 (D.Kan. July 2, 2012); *De Oliveira v. Citicorp N. Am., Inc.*, 2012 WL 1831230, at *2 (M.D.Fla. May 18, 2012); *LaVoice v. UBS Fin. Servs., Inc.*, 2012 WL 124590, at *6 (S.D.N.Y. Jan. 13, 2012); *Iskanian v. CLS Transp. L.A., LLC*, 59 Cal.4th 348, 173 Cal.Rptr.3d 289, 327 P.3d 129, 137–43 (2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 1155, 190 L.Ed.2d 911 (2015).

ganization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

2. This declaration creates "a substantive right" to pursue the foregoing activities. *D.R. Horton*, 2012 WL 36274, at *2.

3. "The Supreme Court specifically stated in *Eastex* [, *Inc. v. NLRB*, 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978)] that [§ 157] 'protects employees from retaliation by their employer when they seek to improve their working conditions through resort to administrative and judicial forums.' *Id.* at 565–566 [98 S.Ct. 2505]. The same is equally true of resort to arbitration." *Id.*

4. "[C]ollective efforts to address workplace wrongs or improve workplace conditions are ... not peripheral but central to the [NLRA's] purposes." *Id.* at *4.

5. The Supreme Court has held "that employers cannot enter into individual agreements with employees in which the employees cede their statutory rights to act collectively." *Id.* at *7 (citing *J.I. Case Co. v. NLRB*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944)).

6. Thus, an agreement requiring arbitration but forbidding any form of class or collective action "clearly and expressly bars employees from exercising substantive rights that have long been held protected by [§ 157] of the NLRA." *Id.* at *5.

7. This ruling does not conflict with the FAA because: (a) the FAA permits a court to refuse to enforce an arbi-

tration contract "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2; and (b) "[t]o find that an arbitration agreement must yield to the NLRA is to treat it no worse than any other private contract that conflicts with Federal labor law." *Id.* at *11.

8. This ruling also does not conflict with the FAA because: (a) "the Supreme Court's jurisprudence under the FAA ... makes clear that the [arbitration] agreement may not require a party to 'forgo the substantive rights afforded by the statute'" (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)); and (b) NLRA § 157 creates a substantive right. *Id.* at *12.

9. This ruling does not conflict with the FAA for a third reason because: (a) the FAA allows nonenforcement of an arbitration agreement "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2; and (b) federal courts will not enforce contractual terms that violate the public policy of the United States. *Id.* at *14. NLRA § 157's policy is "arguably in tension" with the FAA's pro-arbitration policy as expressed by the Supreme Court in *Concepcion*, which held that a California judge-made rule nullifying most class action waivers in arbitration clauses conflicted with federal policy as established in the FAA, and was therefore preempted. However, applying a balancing test from the Restatement (Second) of Contracts regarding the clash of contractual terms with public policy, the NLRA prevails because the NLRA invalidates class-action waivers only in employment contracts, not in all consumer adhesion con-

tracts, and class-wide employment litigation is usually much smaller than consumer class action litigation; thus, "any intrusion on the policies underlying the FAA is ... limited." *Id.* at \*15.

10. "We need not and do not mandate class arbitration in order to protect employees' rights· under the NLRA. Rather, we hold only that employers may not compel employees to waive their NLRA right to collectively pursue litigation of employment claims in *all* forums, arbitral and judicial. So long as the employer leaves open a judicial forum for class and collective claims, employees' NLRA rights are preserved without requiring the availability of classwide arbitration. Employers remain free to insist that ·*arbitral* proceedings be conducted on an individual basis." *Id.* at \*16 (emphasis in original).

11. "Nothing in our holding guarantees class certification; it guarantees only employees' opportunity to pursue without employer coercion, restraint or interference such claims of a class or collective nature as may be available to them under Federal, State or local law. Employees who seek class certification in Federal court will still be required to prove that the requirements for certification under Rule 23 are met, and their employer remains free to assert any and all arguments against certification (other than the [the class waiver provision in the arbitration clause] )." *Id.* at \*12 n. 24; *see also id.* at \*12 ("Rule 23 may be a procedural rule, but the [NLRA § 157] right to act concertedly by invoking Rule 23, [FLSA § ] 216(b), or other legal procedures is not.").

2. *The Applicable Right as Defined by the NLRB*

As will become clear below, the NLRB's crucial argumentative move is to declare that the NLRA § 157 right to act concertedly is "substantive." Before the Court can address the question of substantive versus procedural rights, the Court must first articulate the precise right identified by the NLRB. To the extent the NLRB's articulation flows from its interpretation of the NLRA, which Congress has charged it to administer, that articulation "is entitled to considerable deference." *NLRB. v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL–CIO,* 434 U.S. 335, 350, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978).

The most basic statement of the right is that found in the statutory text: "to engage in ... concerted activities for the purpose of ... mutual aid or protection." 29 U.S.C. § 157. The Supreme Court has favorably cited various lower court decisions standing for the proposition that "the 'mutual aid or protection' clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums"–although the Court avoided "address[ing] ... the question of what may constitute 'concerted' activities in this context." *Eastex,* 437 U.S. at 565–66 & n. 15, 98 S.Ct. 2505. Nonetheless, for purposes of interpreting the NLRA, the NLRB reasonably concluded that "concerted activities" includes attempts to bring class and collective actions.[7]

---

**7.** As explained below in Part IV.B.5, below, class actions and FLSA collective actions did not exist when the NLRA was enacted in 1935. This consideration is important in the ·analysis to follow regarding the conflict be-

"Attempts" is an important word in this context. The NLRB understands that certification of a class action entails various prerequisites that may or may not be satisfied in a given case, and therefore the NLRB cannot declare that the NLRA establishes a right to proceed as a class. Thus, the NLRB held that employees' have a right to an "opportunity to pursue without employer coercion, restraint or interference such claims of a class or collective nature as may be available to them under Federal, State or local law.... [T]heir employer remains free to assert any and all arguments against certification (other than [the class waiver provision in the arbitration clause])." *D.R. Horton,* 2012 WL 36274, at *12 n. 24.

The NLRB's "other than" parenthetical is significant. One could argue that employees subject to an individual arbitration agreement always have an opportunity to *try* to bring a class action, even though they will swiftly be met with a motion to compel individual arbitration. If this opportunity to try and fail is sufficient, then the NLRA's protections would likely only extend to an employer's retaliation against the employees specifically for making such an attempt, not to the act of enforcing the individual arbitration clause. This was, in fact, the position taken by the NLRB's general counsel two years before *D.R. Horton. See id.* at *8. But the NLRB expressly rejected its general counsel's reasoning as too narrow. *Id.* at *9–10.

■ Thus, the right at stake, precisely stated, is the right to attempt to bring a class or collective action free of an *a priori* prohibition on such an attempt. Although this is an odd-sounding right, it is nonetheless a reasonable interpretation of the NLRA. Simply because the success of a

particular concerted action will depend on many uncontrollable factors does not mean that an employer can require an employee to waive his or her right to take that concerted action. Striking may be futile in a supply-heavy labor market, for example, but that does not authorize employers to require employees to waive their right to strike. *Cf. NLRB v. Jahn & Ollier Engraving Co.,* 123 F.2d 589, 593 (7th Cir. 1941) (employer may not require employees to waive their right to strike). Accordingly, the NLRB reasonably interpreted NLRA § 157 as establishing a right to try to engage in concerted activity, such as a class action lawsuit, without a preexisting restriction on that very form of concerted activity.

3. *Whether the Right is Substantive or Procedural*

■ According to the NLRB, one reason why the foregoing right does not conflict with the FAA's preference for arbitration is that the right is "substantive," and Supreme Court arbitration precedent establishes that substantive rights may not be waived. *D.R. Horton,* 2012 WL 36274, at *12. The next question, then, is whether the NLRB appropriately applied the term "substantive."

The NLRA does not itself declare its rights to be "substantive." Rather, the NLRB appears to have adopted the word "substantive" in this context precisely because cases interpreting the FAA have given "substantive" an important meaning that, if applicable, is helpful to the NLRB's position.

■ The NLRB has no special expertise in, and is not charged with administering, the FAA. This Court need not defer to

tween the NLRA and the FAA. It is of much less importance, however, when determining whether the NLRB reasonably interpreted the NLRA. *See NLRB v. J. Weingarten, Inc.,* 420

U.S. 251, 266, 95 S.Ct. 976, 43 L.Ed.2d 171 (1975) ("The responsibility to adapt the [NLRA] to changing patterns of industrial life is entrusted to the [NLRB].'").

the NLRB's conclusion that the right at stake is "substantive" for FAA purposes. *See, e.g., Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 143–44, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (no deference due to NLRB where it interprets a statute "far removed from its expertise").

This Court will not exhaustively discuss the concept of substantive versus procedural rights. Very generally speaking, substantive rights are those "that can be protected or enforced by law," while procedural rights are those "that help[ ] in the protection or enforcement of a substantive right." *Black's Law Dictionary* 1437, 1438 (9th ed.2009). In some contexts, this can be a crucial distinction. For example, the Rules Enabling Act provides that the rules promulgated under its auspices (*e.g.*, the Federal Rules of Civil Procedure) "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). The Rules Enabling Act did not define "substantive," but at the time it became law in 1934, *see* Pub.L. No. 73–415, 48 Stat. 1064, substance and procedure bore essentially the same distinction as they do today. Substance, or "substantive law," referred to "[t]hat part of the law which creates, defines, and regulates rights," and was defined in opposition to "the rules according to which the substantive law itself is administered." *Black's Law Dictionary* 1672 (3d ed.1933). Appropriately, in this light, procedure was defined as "[t]he mode of proceeding by which a legal right is enforced, as distinguished from the law which gives or defines the right." *Id.* at 1430.

As far as this Court's research has revealed, the Supreme Court's first application of the substance/procedure distinction to an arbitrability dispute was in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). There, the Supreme Court held that federal antitrust claims may be arbitrated. *Id.* at 640, 105 S.Ct. 3346. In the process, the Court declared that the antitrust plaintiff in arbitration would give up only procedural, not substantive, rights:

> By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.

*Id.* at 628, 105 S.Ct. 3346.

This distinction surfaced again in the Supreme Court's *Gilmer* decision, on which the NLRB relied in *D.R. Horton*. *See* 2012 WL 36274, at *12. *Gilmer* addressed whether claims brought under the Age Discrimination in Employment Act ("ADEA") may be resolved through arbitration. 500 U.S. at 23, 111 S.Ct. 1647. The Supreme Court said yes. *Id.* at 35, 111 S.Ct. 1647. It relied, in part, on the portion of *Mitsubishi Motors* quoted immediately above, thus indicating that the ADEA was the "substance" that could be subjected, by agreement, to a different procedure, but not *a priori* waived. *Id.* at 26, 111 S.Ct. 1647.

Consistent with *Mitsubishi Motors* and *Gilmer*, subsequent Supreme Court decisions discussing the "substantive" rights at issue in the potential arbitration have referred to the rights established by the statute under which the plaintiff was suing. *See Italian Colors*, 133 S.Ct. at 2310 (antitrust class action); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 132 S.Ct. 665, 669, 181 L.Ed.2d 586 (2012) (Credit Repair Organizations Act). On this basis alone, the NLRB was incorrect to describe as "substantive" the right to try to bring a class action. When discussing rights that may

be waived (procedural) versus those that may not (substantive), the Supreme Court has never used "substantive" to mean anything but the statutory rights that give rise to the plaintiff's cause of action. FLSA plaintiffs, such as those here and those in *D.R. Horton*, are not suing under the NLRA (the source of the "substantive" right recognized in *D.R. Horton*). Thus, the NLRB had no sound basis for adopting the label "substantive."

Even so, it bears noting that the NLRB interprets NLRA § 157 as creating a substantive right to invoke a specific procedure. *See D.R. Horton*, 2012 WL 36274, at *12 ("Rule 23 may be a procedural rule, but the [NLRA § 157] right to act concertedly by invoking Rule 23, [FLSA § ] 216(b), or other legal procedures is not."). The Supreme Court has effectively described the FAA in the same way. Specifically, the Supreme Court has declared that FAA § 2 (9 U.S.C. § 2), which establishes the enforceability of arbitration contracts, is the "primary substantive provision of the [FAA]." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). In other words, if arbitration is merely a type of dispute resolution procedure and not an encroachment on substantive rights, then the FAA creates a substantive right to a procedure. Nonetheless, the Supreme Court's recent *Italian Colors* decision effectively mandates the conclusion that any claim to a right to try to proceed as a class is waivable, regardless of whether the rights under the NLRA (or the FAA) are considered substantive or procedural.

*Italian Colors* involved, on the one hand, an arbitration clause with a class action waiver in the contract between American Express and certain merchants that accept its cards, and, on the other hand, those merchants' attempt to bring an antitrust lawsuit against American Express as a class action in court despite the waiver.

133 S.Ct. at 2308. In upholding the waiver, the Supreme Court noted that Federal Rule of Civil Procedure 23 (governing class actions) creates no entitlement to proceed as a class because Rule 23 contains prerequisites to class certification that cannot be met simply by asserting a particular cause of action. *Id.* at 2309–10. The Court then went on to address the argument "that federal law secures a nonwaivable *opportunity* to vindicate federal policies by satisfying the procedural strictures of Rule 23 or invoking some other informal class mechanism and arbitration. But we have already rejected that proposition in [*Concepcion*, discussed below]." *Id.* at 2310 (emphasis in original).

This precisely describes the sort of right put forth in *D.R. Horton*—"our holding guarantees ... employees' opportunity to pursue ... such claims of a class or collective nature as may be available to them under Federal, State or local law," 2012 WL 36274, at *12 n. 24—and it precisely rejects it. Thus, whether one refers to it as a substantive right, a procedural right, or a substantive right to a procedure, the Supreme Court has already established that there is no such thing as a nonwaivable opportunity to vindicate federal policies through an attempt at a class action. Accordingly, the NLRB was incorrect to find otherwise.

### 4. *Alleged Neutral Treatment*

Another reason the NLRB gave for finding that the NLRA and FAA do not conflict is that the FAA permits a court to refuse to enforce an arbitration contract "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. According to the NLRB, "[t]o find that an arbitration agreement must yield to the NLRA is to treat it no worse than any other private contract that conflicts with Federal labor law." *D.R.*

*Horton,* 2012 WL 36274, at *11. The Supreme Court's *Concepcion* decision fatally undermines this reasoning.

■■■ The starting point for understanding *Concepcion* in this context is a case from a year earlier, *Stolt–Nielsen S.A. v. AnimalFeeds International Corp.,* 559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010). *Stolt–Nielsen* was a dispute in which the parties' arbitration agreement said nothing about whether class arbitration was permissible. *Id.* at 667, 130 S.Ct. 1758. The arbitrators concluded that they would permit class arbitration. *Id.* at 668–69, 130 S.Ct. 1758. The defendant sought judicial review of that conclusion, and the Supreme Court ultimately reversed the arbitrators' decision. The Court reasoned that the policy of the FAA is to promote less-expensive, informal dispute resolution procedures, whereas "class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator." *Id.* at 685, 130 S.Ct. 1758. Thus, "bilateral arbitration" is the default presumption when an arbitration clause is silent, *id.* and "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so," *id.* at 684, 130 S.Ct. 1758 (emphasis added).

*Stolt–Nielsen's* view of arbitration as "bilateral" by default was an important premise in the following year's *Concepcion* decision. *Concepcion* was a proposed class-action by various AT & T cellphone customers against AT & T for allegedly wrongful charges. 563 U.S. at 337, 131 S.Ct. 1740. However, the service contract between the customers and AT & T contained an arbitration clause with a class action waiver. *Id.* at 336–37, 131 S.Ct. 1740. The federal district court denied AT & T's motion to compel arbitration based on the California Supreme Court's *"Discover Bank* rule." *Id.* at 338, 131 S.Ct. 1740.

In *Discover Bank,* the California Supreme Court addressed class-action waivers in consumer adhesion contracts where disputes were likely to be small-dollar and the plaintiff alleges that the defendant carried out a deliberate scheme to cheat large numbers of consumers out of individually small amounts. *Discover Bank v. Superior Court,* 36 Cal.4th 148, 30 Cal. Rptr.3d 76, 113 P.3d 1100, 1110 (Cal. 2005). The California Supreme Court deemed such class waivers unconscionable given that they would effectively permit the defendant to excuse itself from its own fraud. *Id.* The court found no conflict with the FAA because its holding did not apply to arbitration agreements specifically, "but to contracts generally. In other words, it applies equally to class action litigation waivers in contracts without arbitration agreements as it does to class arbitration waivers in contracts with such agreements." *Id.,* 30 Cal.Rptr.3d 76, 113 P.3d at 1112. Thus, said the court, it fell within FAA § 2's exception for "such grounds as exist at law or in equity for the revocation of any contract." *Id.*

The court further reasoned, however, that "not enforcing arbitration agreements and [instead] requiring class action litigation" was "unacceptable." *Id.,* 30 Cal. Rptr.3d 76, 113 P.3d at 1116. The court accordingly declared only the class action waiver unconscionable, not the entire arbitration agreement. *Id.,* 30 Cal.Rptr.3d 76, 113 P.3d at 1113 ("In the present case, the enforceability of the arbitration agreement itself is not in question, only enforcement of the class action waiver."). In other words, in the view of the California Supreme Court, the appropriate outcome was classwide arbitration. *Id.,* 30 Cal.Rptr.3d 76, 113 P.3d at 1116–17.

In *Concepcion*, the U.S. Supreme Court disagreed with essentially every conclusion in *Discover Bank*. The Court found that *Discover Bank*'s application of California unconscionability law, although nominally applicable both within and without arbitration, "interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Concepcion*, 563 U.S. at 344, 131 S.Ct. 1740. Important to the Court's analysis was the notion that *Discover Bank* "does not *require* classwide arbitration, [but] it allows any party to a consumer contract to demand it *ex post*." *Id.* at 346, 131 S.Ct. 1740 (emphasis in original). As explained in *Stolt–Nielsen*, this is "inconsistent with the FAA" because "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration–its informality–and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 348, 131 S.Ct. 1740. Although parties could specifically agree to classwide arbitration, "what the parties ... would have agreed to [in that case] is not arbitration as envisioned by the FAA, lacks its benefits, and therefore may not be required by state law," as *Discover Bank* did. *Id.* at 351, 131 S.Ct. 1740.

*Stolt–Nielsen* and *Concepcion* establish that arbitration under the FAA means "bilateral arbitration" absent a specific agreement to the contrary. In that light, the NLRB may not validly claim that "[t]o find that an arbitration agreement must yield to the NLRA is to treat it no worse than any other private contract that conflicts with Federal labor law." *D.R. Horton*, 2012 WL 36274, at *11. Rather, although *D.R. Horton* supposedly applies equally to class-action *litigation* waivers, its practical effect is to nullify an employer's ability to engage in *arbitration* as envisioned by the FAA. Indeed, *D.R. Horton*'s interference with arbitration actually goes further than *Discover Bank*'s. *Discover Bank* at least allowed the defendant to continue to arbitration, albeit against a class of plaintiffs. *D.R. Horton*, by contrast, requires class litigation, permitting arbitration only when an employee brings an individual claim. In other words, whether the employer may go to arbitration is effectively at the election of the employee. Such a rule "disfavors or interferes with arbitration." *Concepcion*, 563 U.S. at 334, 131 S.Ct. 1740. Accordingly, contrary to *D.R. Horton*, it cannot be said to present "grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

### 5. Conflict of Policies

Drawing again on FAA § 2, the NLRB further found that its interpretation of NLRA § 157 would prevail over the FAA because of the general rule that contracts of any type that conflict with federal public policy will not be enforced. *D.R. Horton*, 2012 WL 36274, at *14. The NLRB concluded that NLRA § 157 establishes a generally applicable federal public policy against any sort of concerted action waiver, including a class action waiver. *Id.* Accordingly, public policy was a "ground[ ] ... at law ... for the revocation of any contract." 9 U.S.C. § 2. The Court disagrees.

The NLRB correctly recognized that the public policy embodied in NLRA § 157 does not automatically override any other federal policy. *D.R. Horton*, 2012 WL 36274, at *10. The NLRB further recognized, correctly, that the policies expressed in the FAA required consideration. *Id.* Finally, the NLRB acknowledged, again correctly, that the FAA's policies as articulated by *Concepcion* are at least "arguably in tension" with an interpretation of NLRA § 157 that invalidates class-action waivers. *Id.* at *15.

The NLRB's first reasoning error occurred in the standard it adopted to re-

solve this conflict. The NLRB invoked Restatement (Second) of Contracts § 178, which counsels courts to weigh contractual interests versus public policy interests when choosing whether to invalidate a contractual term on public policy grounds. The obvious implication is that a court will be comparing a *contract* to some embodiment of public policy (statutes, case law, etc.). The NLRB cites no authority for applying this balancing test to two allegedly conflicting *statutes* (here, the FAA and the NLRA).

The NLRB's second reasoning error was to overlook *Mitsubishi Motors*, which established that "if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." 473 U.S. at 628, 105 S.Ct. 3346. The NLRB never considered the NLRA's text or legislative history in this regard. Moreover, the NLRB did not have the benefit of the Supreme Court's *CompuCredit* and *Italian Colors* decisions, handed down after *D.R. Horton*. *CompuCredit* and *Italian Colors* both built on Mitsubishi Motors to establish that a Congressional exemption from the FAA must be a specific "command." *Italian Colors*, 133 S.Ct. at 2309; *CompuCredit*, 132 S.Ct. at 669.[8] Statutory text referring to bringing an "action" in "court" is not enough.

*Id.* at 670. Nor, importantly, is the claim that the statute's policies would be undermined by an inability to bring a class action in court due to an individual arbitration clause. *Italian Colors*, 133 S.Ct. at 2309. Regardless of that potential effect on other Congressional policies, the question is whether Congress "commanded" the FAA's inapplicability. *Id.* Relevant to that inquiry, according to *Italian Colors*, is whether class-action procedures existed when the statute in question was enacted. *Id.* If not, it is difficult to say that Congress commanded the FAA's inapplicability to preserve the opportunity to proceed as a class. *Id.*

Of course, none of these decisions specifically addresses the NLRA. But experienced chess players know when they have been inexorably outmaneuvered, and will extend a hand of resignation before checkmate. Here, the Supreme Court has all but checkmated the NLRB's position. The claim that the NLRA will be undermined absent the ability to bring class actions in court is not an appropriate basis to find that the NLRA overrides the FAA's "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors*, 473 U.S. at 631, 105 S.Ct. 3346. Moreover, the NLRA was enacted in 1935, *see* 49 Stat. 449, long before the birth of the modern federal court class action in 1966. *See* Fed.R.Civ.P. 23, Advisory Com-

---

**8.** One could argue that the inquiry in *Mitsubishi Motors*, *CompuCredit*, and *Italian Colors* does not fit the present situation. In those cases, the question was whether the statute creating the cause of action (the source of the "substantive" right) clearly exempted such claims from the FAA's scope. Here, we are not talking about the statute that creates the cause of action, but about the NLRA, which establishes an overarching principle applicable to many employment-related causes of action. Thus, the argument would go, it makes little sense to inquire whether Congress intended to exempt NLRA-created causes of action from the FAA because no

such causes of action are at issue here. The Court rejects this argument because it suggests that NLRA § 157 expresses a public policy that is impervious to comparison with other statutory policies. Not even the NLRB goes that far. *See D.R. Horton*, 2012 WL 36274, at *10. Or, at best, it simply leaves open the question of how to compare two statutes, both of which establish arguably overarching rights. Under the circumstances, the approach described in *Mitsubishi Motors*, *CompuCredit*, and *Italian Colors* appears to be the approach the Supreme Court would adopt if it concluded that those cases do not already apply of their own force.

mittee Notes to 1966 Amendments. The NLRA also predates the FLSA and its statutory collective action procedure, enacted in 1938. *See* Pub.L. No. 75–718, 52 Stat. 1060.[9] Thus, under *Italian Colors*, it is very difficult to say that Congress commanded that the rights established in the NLRA trump the arbitrability presumption established in the FAA. Accordingly, *D.R. Horton* incorrectly determined that the NLRA's policies prevail over the FAA's. For all of these reasons, this Court declines to follow *D.R. Horton*.

**C. Joinder**

██ Plaintiffs argue that, even if the NLRA does not override their class-action waivers, "this does not mean that the 102 (and growing) Plaintiffs cannot pursue a single arbitration by joining their respective claims in one proceeding. Defendants' requests for 'individual' arbitrations [are] not supported by either the contract language or the law." (ECF No. 115 at 18 (emphasis removed).) But this is simply an evasion of Plaintiffs' inability to bring a class action. Any arbitrator who joined 102 plaintiffs into the same action would necessarily need to consider, for example, how to resolve common questions of law and fact. At that point, the proceeding is a class action, even if not formally designated as such. *See Italian Colors*, 133 S.Ct. at 2310 (foreclosing "some other informal class mechanism" as a means to achieve class treatment in arbitration).

Moreover, even if "Defendants' requests for 'individual' arbitrations [are] not supported by ... the contract language," Plaintiffs' argument would still fail. Under *Stolt–Nielsen*, Plaintiffs must show that Defendants affirmatively agreed to something other than the typical "bilateral" arbitration. 559 U.S. at 684, 130 S.Ct.

1758. Plaintiffs have made no such showing. Accordingly, Plaintiffs may not attempt through joinder what they could not achieve through formal class-action procedures.

**V. CONCLUSION**

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion to Compel Arbitration (ECF No. 67) is GRANTED IN PART and DENIED IN PART as follows:

   a. each Plaintiff, to the extent he or she wishes to pursue his or her claim, must individually arbitrate with Defendants;

   b. however, any portion of any Agreement that any Plaintiff may have with Defendant(s) is SEVERED to the extent it (a) establishes fee– or cost-shifting obligations different from those established in 29 U.S.C. § 216(b), or (b) purports to require that FLSA claims be brought solely against Defendant ETS PC, Inc.;

   c. this action is hereby STAYED pending the conclusion of Plaintiffs' individual arbitration proceedings; and

   d. Defendants' Motion to Compel Arbitration is otherwise DENIED;

2. Plaintiffs' Motion for Conditional Certification as a Collective Action (ECF No. 150) and Plaintiffs' Motion to Toll Statute of Limitations for FLSA Class Members (ECF No. 151) are DENIED AS MOOT; and

3. Pursuant to D.C.COLO.LCivR 41.2, the Clerk shall ADMINISTRATIVELY CLOSE this case, subject to a motion to reopen for good cause subsequent to the conclusion of the Plain-

---

**9.** Plaintiffs have not argued that FLSA § 216(b)'s collective action procedure is, of its own force, non-waivable. The Court there-

fore has no occasion to examine such a possibility.

tiffs' individual arbitration proceedings.

Dated this 12th day of May, 2016.